Gerald G. Wood and Debra L. Wood, Plaintiffs-Appellants,

v.

City of Madison, a Wisconsin municipal corporation, City of Madison Common Council, an approving authority of the City of Madison, City of Madison Plan Commission, a commission created by the City of Madison, Mark A. Olinger, Secretary of City of Madison Plan Commission, and Ray Fisher, Madison City Clerk-Treasurer, Defendants-Respondents.

Supreme Court

*No. 01–1206. Oral argument October 8, 2002.—Decided April 11, 2003.*

2003 WI 24

(Also reported in 659 N.W.2d 31.)

For the plaintiffs-appellants there were briefs (in the court of appeals) by *Troy M. Hellenbrand* and *Hellenbrand & Hellenbrand S.C.,* Waunakee, and *Bruce K. Kaufmann* and *Law Office of Bruce K. Kaufmann,* Madison, and oral argument by *Troy M. Hellenbrand.*

For the defendants-respondents the cause was argued by *James M. Voss,* assistant city attorney, with whom on the brief was *Larry W. O'Brien,* acting city attorney.

An amicus curiae brief was filed by *John A. Kassner* and *Brennan, Steil, Basting & MacDougall, S.C.,* Madison, on behalf of the Wisconsin Realtors Association, and there was oral argument by *John A. Kassner.*

An amicus curiae brief was filed by *Mark B. Hazelbaker,* Madison, on behalf of the Dane County Towns Association.

An amicus curiae brief was filed by *Claire Silverman,* Madison, on behalf of the League of Wisconsin Municipalities.

An amicus curiae brief was filed by *Carol B. Nawrocki,* Shawano, on behalf of the Wisconsin Towns Association.

¶ 1. ANN WALSH BRADLEY, J. This case is before the court on certification from the court of appeals.[1] The plaintiffs-appellants, Gerald and Debra Wood (the Woods) contend that the City of Madison (Madison)[2] improperly used its plat approval authority to mandate land use through a subdivision ordinance. In essence, they assert that Madison used its platting authority to perform a zoning function.

¶ 2. In its certification, the court of appeals more precisely states the issue as follows:

> Does Wis. Stat. ch. 236 authorize a municipality to reject a preliminary plat under its extraterritorial jurisdictional authority based on a subdivision ordinance that considers the plat's proposed use?

In addition, the court of appeals requests that we review the holding in *Gordie Boucher Lincoln-Mercury v. Madison Plan Comm'n,* 178 Wis. 2d 74, 503 N.W.2d 265 (Ct. App. 1993), which previously addressed this

---

[1] The plaintiffs-appellants appeal an order of the Circuit Court for Dane County, Richard J. Callaway, Judge, denying their writ of certiorari and affirming the decision of the City of Madison Common Council.

[2] We will refer to the several defendants in this case collectively as "the City of Madison" or "Madison."

issue. The court of appeals advances that *Gordie Boucher* "was probably wrongly decided."

¶ 3. In response to the issue presented, we conclude that Wis. Stat. ch. 236 (1999–2000)[3] does authorize a municipality to reject a preliminary plat under its extraterritorial jurisdictional authority based upon a subdivision ordinance that considers the plat's proposed use. Because *Gordie Boucher* declared otherwise, we agree with the court of appeals that it was in error. We also conclude that the standards set forth in the subdivision ordinance in this case were neither vague nor applied in an arbitrary, unreasonable, or discriminatory manner. Accordingly, we determine that the City of Madison acted within its authority, and we affirm the circuit court order which upheld Madison's rejection of the Woods' plat.

I

¶ 4. The facts of this case are not in significant dispute. The Woods own a 51.96 acre parcel of land east of Interstate Highway 90/94. Although the parcel is in the Town of Burke, it is also within Madison's extraterritorial plat approval jurisdiction.[4] Although some property adjacent to the Woods' plat is zoned for commercial use, much of the land to the east and west of the Woods' plat is zoned for agricultural purposes, and is used accordingly.

¶ 5. The Woods submitted an extraterritorial plat and land division application to the City of Madison,

---

[3] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

[4] "Extraterritorial plat jurisdiction" refers to the unincorporated area within 3 miles of the corporate limits of a first, second, or third class city, or 1 1/2 miles of a fourth class city or a village. Wis. Stat. § 236.02(5).

seeking approval of a preliminary plat[5] that would divide their property into eleven lots.[6] The Woods sought to change the zoning of nine of the proposed new lots from "Agricultural" to "Commercial."

¶ 6.　The City of Madison Department of Planning and Development issued a report analyzing the proposed plat under both the "Criteria for Agricultural Land Division" and the "Criteria for Non-Agricultural Land Division or Subdivision" of Madison General Ordinance (MGO) § 16.23(3)(c)1–2. The report stated that the preliminary plat failed to meet the agricultural land division criteria because it did not "assist and assure the continuation of agricultural land use on this property."

¶ 7.　In considering the preliminary plat under the non-agricultural land division criteria, the report concluded that the development of the commercial lots would be incompatible with and would negatively impact the remaining lots and adjacent agricultural lands. It also concluded that commercial development would not constitute "infill," as little of the surrounding area featured commercial use. An addendum to the report indicated that "the Planning Unit concludes that the proposed subdivision plat does not meet the standards for approval at this time." The report recommended that the City of Madison Common Council reject the resolution approving the preliminary plat.

---

[5] A "preliminary plat" is "a map showing the salient features of a proposed subdivision submitted to an approving authority for purposes of preliminary consideration." Wis. Stat. § 236.02(9).

[6] The Town of Burke had previously approved the preliminary plat and the Woods' rezoning petition. The Dane County Zoning and Natural Resources Committee had conditionally approved both the preliminary plat and the rezoning petition.

¶ 8. The City of Madison Plan Commission considered the Woods' application at two separate public hearings, on March 20, 2000 and May 15, 2000. At the first hearing, three representatives of the Woods spoke on their behalf.[7] After the second hearing, the plan commission recommended denying the Woods' application.

¶ 9. The Common Council subsequently adopted the plan commission's recommendation and rejected the proposed plat. Noting that "the area [adjacent to the Woods' land] is largely agricultur[al]," it concluded that "[t]he subdivision of the bulk of the agricultural lands that exist on the Wood property would be a significant expansion of commercial land use in this area, and create additional pressures on the conversion of the remaining agricultural lands that exist on the Wood parcel, as well as adjacent agriculturally-utilized lands."

¶ 10. The Woods petitioned the Dane County Circuit Court for certiorari review of the City of Madison's decision, pursuant to Wis. Stat. §§ 236.15(5) and 62.23(7)(e)10. The court affirmed Madison's rejection of the plat, finding that the City "did not violate any part of" chapter 236, and that the City's decision was intended to further the quality of the subdivision. It also concluded that the rejection of the plat was "clearly grounded in the plain language of the non-agricultural criteria" of MGO § 16.23. The Woods appealed to the court of appeals, which subsequently certified the appeal to this court.

---

[7] At the March 20, 2000 hearing, Dan Birrenkott (representing the Woods), Sam Simon, and Sean Wolf registered and spoke in support of the Woods' preliminary plat application. Birrenkott was the Woods' surveyor; Simon was their real estate agent.

## II

¶ 11. Resolution of the issue set forth in the certification by the court of appeals requires us to interpret portions of chapters 62 and 236 of the Wisconsin Statutes. Statutory interpretation presents a question of law subject to independent appellate review. *Lake City Corp. v. City of Mequon*, 207 Wis. 2d 155, 162, 563 N.W.2d 145 (1997).

¶ 12. Resolution of the remaining issues requires us to review the decision by the Madison Common Council rejecting the Woods' preliminary plat. Appeals from the rejection of a plat are governed by Wis. Stat. §§ 236.13(5) and 62.23(7)(e)10. A person aggrieved by such a rejection may commence a certiorari action. Wis. Stat. § 62.23(7)(e)10. On certiorari, a court "shall direct that the plat be approved if it finds that the action of the approving authority . . . is arbitrary, unreasonable or discriminatory." Wis. Stat. § 236.13(5). On appeal from an order or judgment entered on certiorari, a reviewing court reviews the record of the agency, not the findings or judgment of the circuit court. *Hoepker v. City of Madison Plan Comm'n*, 209 Wis. 2d 663, 563 N.W.2d 145 (1997). Whether an agency has exceeded its authority in rejecting a plat also presents a question of law, subject to independent appellate review. *Pederson v. Town Bd. of Town of Windsor*, 191 Wis. 2d 663, 669 n.2, 530 N.W.2d 427 (Ct. App. 1995).

## III

¶ 13. We begin with the issue presented by the court of appeals:

78

> Does Wis. Stat. ch. 236 authorize a municipality to reject a preliminary plat under its extraterritorial jurisdictional authority based on a subdivision ordinance that considers the plat's proposed use?

Chapter 236 of the Wisconsin Statutes is entitled "Platting Lands and Recording and Vacating Plats." It "regulates intensively the process by which land can be divided into building sites." *Town of Sun Prairie v. Storms,* 110 Wis. 2d 58, 61, 327 N.W.2d 642 (1983). The purpose of the chapter is set out in Wis. Stat. § 236.01:

> The purpose of this chapter is to regulate the subdivision of land to promote public health, safety and general welfare; to further the orderly layout and use of land; to prevent the overcrowding of land; to lessen congestion in the streets and highways; to provide for adequate light and air; to facilitate adequate provision for water, sewerage and other public requirements; to provide for proper ingress and egress; and to promote proper monumenting of land subdivided and conveyancing by accurate legal description. The approvals to be obtained by the subdivider as required in this chapter shall be based on requirements designed to accomplish the aforesaid purposes.

¶ 14. Wisconsin requires that all subdivisions be surveyed and that all plats be approved before they can be recorded. Wis. Stat. § 236.03(1). Local governments with planning agencies have the power to approve subdivision plats. *Storms,* 110 Wis. 2d at 61; *Mequon v. Lake Estates Co.,* 52 Wis. 2d 765, 773, 190 N.W.2d 912 (1971). Plats located within the extraterritorial plat approval jurisdiction of a municipality require approval by the town board, the county planning agency, and the

governing body of the municipality or its planning committee or commission. Wis. Stat. §§ 236.10(1)(b)1. and 3.; 236.10(3).

¶ 15. Approval of any plat is also conditioned on compliance with any subdivision ordinance validly enacted by the appropriate municipality, town, or county. Wis. Stat. § 236.13(1)(b). If multiple governing bodies or agencies with authority to approve or reject a plat have ordinances with conflicting requirements, the plat must comply with the most restrictive requirements. Wis. Stat. § 236.13(4).

¶ 16. In Wis. Stat. § 236.45, the legislature has permitted municipalities, towns, and counties, if they have established planning agencies, to legislate more intensively in the field of subdivision control than provided for the state at large by allowing them to adopt ordinances which are more restrictive than the provisions of ch. 236. Section 236.45(3) authorizes municipalities to utilize their subdivision ordinances within their extraterritorial plat approval jurisdiction.

¶ 17. Wisconsin Stat. § 236.45(1) explains the legislative intent behind the additional subdivision plat approval authority granted under the section:

> (1) Declaration of legislative intent. *The purpose of this section is to* promote the public health, safety and general welfare of the community and the regulations authorized to be made are designed to . . . *further the orderly layout and use of land;* . . . to prevent the overcrowding of land; to avoid undue concentration of population; . . . . *The regulations provided for by this section shall be made with reasonable consideration, among other things, of the character of the municipality, town or county with a view of* conserving the value of the buildings placed upon land, providing the best possible environment for human habitation, and for

*encouraging the most appropriate use of land through-*
*out the municipality, town or county.*

Wis. Stat. § 236.45(1) (emphasis added).

¶ 18. In *Mequon,* 52 Wis. 2d at 774, we described
the statement of legislative intent in § 236.45(1) as
"indicat[ing] that the purpose of the law is to permit a
municipality to adopt regulations encouraging the most
appropriate use of land throughout." Noting that under
§ 236.45(2)(b), "any ordinance adopted by a municipal-
ity shall be liberally construed in favor of the munici-
pality," we described § 236.45 as granting wide discre-
tion that a municipality may exercise by ordinance or
appropriate resolution. *Id.*

¶ 19. The plain language of the declaration of
intent in § 236.45(1) leaves no doubt that subdivision
regulations and ordinances may consider the use of
land. In fact, the statute requires that such ordinances
"*shall* be made with reasonable consideration . . . of the
character of the municipality, town or county with a
view . . . for encouraging the most appropriate use of
land throughout the municipality, town or county." Wis.
Stat. § 236.45(1) (emphasis added).

¶ 20. The Woods present no argument to the
contrary regarding the meaning of the term "use" as set
forth in § 236.45(1). They do not claim that the word
"use" in the context of the phrase "encouraging the most
appropriate use of land" refers to something other than
the common, ordinary meaning of the word.

¶ 21. Notwithstanding the explicit language in
Wis. Stat. § 236.45(1) authorizing the planning agen-
cies of municipalities, towns, and counties to enact
subdivision ordinances that consider the "most appro-
priate use of land," the Woods contend that the use of

property may not properly be the subject of subdivision approval authority under chapter 236. They assert that platting authority is inherently different from zoning authority and that only zoning regulations may consider the use of land. In essence, they claim that Wis. Stat. § 62.23 relating to city planning, and in particular subsections (7) and (7a) of the statute, on zoning and extraterritorial zoning, respectively, provide the sole authorization for municipal regulations concerning land use.[8]

¶ 22. Wisconsin Stat. § 62.23(7)(a) authorizes cities to regulate by zoning:

> (a) Grant of power. For the purpose of promoting health, safety, morals or the general welfare of the community, the council may regulate and restrict by ordinance, . . . the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, mining, residence or other purposes . . . .

Cities are authorized under § 62.23(7)(b) to "divide the city into districts . . . as may be deemed best suited to carry out the purposes" of the chapter. Within zoning districts, cities may "regulate and restrict the erection, construction, reconstruction, alteration or use of buildings, structures or land." Wis. Stat. § 62.23(7)(b).

¶ 23. The purposes of zoning are listed in § 62.23(7)(c), and apply as well to extraterritorial zoning under Wis. Stat. § 62.23(7a).[9] The listed purposes are remarkably similar to those which underlie subdi-

---

[8] The argument regarding the interaction of chapters 62 and 236 is more fully set forth in the brief and oral argument of the Wisconsin Realtors Association, as amicus curiae in support of the Woods.

[9] Wisconsin Stat. § 62.23(7)(c) provides:

vision plat approval authority under § 236.45(1). Notably, both zoning and subdivision plat approval authority state that regulation "shall be made with reasonable consideration . . . of the character of the district . . . with a view to . . . encouraging the most appropriate use of land." Wis. Stat. §§ 62.23(7)(c) and 236.45(1).

¶ 24. Although the legislature has conferred upon cities both extraterritorial zoning authority and extraterritorial subdivision plat approval authority, and has stated that the purposes for each type of regulation are nearly identical, the Woods insist that the use of land may not be considered in subdivision plat approval decisions. They largely base their contention on *Gordie Boucher*, 178 Wis. 2d 74, a case decided by the court of appeals in 1993.

¶ 25. *Gordie Boucher* concerned the City of Madison Common Council's denial of a certified survey map (CSM) which a corporation (Boucher) had submitted because it wanted to locate an automobile dealership on a lot in the Madison-Sun Prairie visual open space separation district. The lot's zoning permitted the proposed use of land, and the Town of Burke and Dane

Purposes in view. Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air, including access to sunlight for solar collectors and to wind for wind energy systems; to encourage the protection of groundwater resources; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements; and to preserve burial sites, as defined in s. 157.70(1)(b). Such regulations shall be made with reasonable consideration, among other things, of the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such city.

County conditionally approved the CSM. *Id.* at 82–83. The City of Madison denied Boucher's CSM for several reasons. However, on appeal it relied on only one of the reasons: "The proposed survey is not consistent with the City's Master Plan, including the Peripheral Area Development Plan, the Land Use Plan, and the Parks and Open Space Plan." *Id.* at 83.

¶ 26. On certiorari review, the circuit court concluded that Madison's rejection of Boucher's CSM based on inconsistency with the city's master plan constituted extraterritorial zoning. The court determined that the city "used its plat approval authority to regulate for what, as opposed to how, the parcel may be used." *Id.* at 89. It therefore ordered the city to conditionally approve the CSM pursuant to Wis. Stat. § 236.13(5). *Id.* at 83–84.

¶ 27. On appeal, the issue was "whether the plan commission engaged in zoning when it used its plat approval authority to control land use in the city's extraterritorial plat approval jurisdiction." *Id.* at 93. The court of appeals determined that the City of Madison had engaged in zoning by controlling land use. It stated:

> In this case, however, the approving authority has rejected a proposed land division for reasons having nothing to do with the quality of the division. It is the *use* to which Boucher proposes to put lot two which the commission claims justifies its rejection of its CSM. Land use control is the function of zoning.

*Id.* at 98 (emphasis in original).

¶ 28. The *Gordie Boucher* court drew a clear distinction between zoning and subdivision approval. It concluded:

> While ch. 236, Stats., and sec. 236.45, Stats., confer

broad regulatory authority upon local governing bodies, that authority relates to the *quality of the subdivision or land division* and *not to the use to which the lots in the subdivision or land division may be put. Control over the use to which property may be devoted is a zoning control* which can be imposed only by a comprehensive zoning ordinance enacted as required by the zoning enabling act.

*Id.* at 101–02 (emphasis added).

¶ 29. The court in *Gordie Boucher* recognized an overlap between zoning and platting when plat approval imposes "quality" requirements. *Id.* at 96. However, it did not clearly explain the meaning of "quality" in this context. It noted that "quality" considerations include "the orderly layout and use of land." *Id.* As the court of appeals stated in its certification of this case, "[i]n many cases it will be impossible to distinguish a 'quality' requirement from a use restriction because regulating uses is generally aimed at maintaining a high quality of living."

¶ 30. Thus, we do not believe the "quality" standard referred to in *Gordie Boucher* to distinguish between zoning functions and subdivision approval functions is tenable. Under the plain language of the declaration of legislative intent in § 236.45(1), all subdivision regulations "shall" be made with a view for "encouraging the most appropriate use of land throughout the municipality, town or county." Therefore, any regulation relating to the "quality" of a subdivision must necessarily consider the "most appropriate use" of land. We cannot fathom how an ordinance can consider the most appropriate use of land if it cannot consider the use of land.

¶ 31. As noted above, in certifying the issue presented in this case, the court of appeals concluded that

"*Gordie Boucher* was probably wrongly decided." The court of appeals questioned the reasoning in *Gordie Boucher:* "we believe that the mutually exclusive view of zoning and platting that *Gordie Boucher* adopted is somewhat artificial and unsupported by either Wisconsin case law or statutes."[10]

¶ 32. The certification specifically points to the language in Wis. Stat. § 236.45 requiring that governmental bodies enacting subdivision ordinances do so with a view of "encouraging the most appropriate use of land throughout the municipality, town or county." The court of appeals notes that it did not address the above-quoted language in *Gordie Boucher,* and asserts that it "believe[s] the legislature has expressed approval for municipalities to include in their subdivision ordinances and master plans considerations regarding the proposed use of a plat."

¶ 33. We agree with the court of appeals that the holding in *Gordie Boucher* does not accurately reflect the law and must be overruled. Although *Gordie Boucher* correctly noted that zoning and subdivision plat approval authority are different types of land use controls which do not serve identical purposes, it incorrectly concluded that subdivision plat approval authority may not consider the appropriate use of land.

¶ 34. The court did not attempt to reconcile its conclusion that land use is strictly a zoning issue with the final sentence in § 236.45(1): "The regulations

---

[10] The court of appeals acknowledged in its certification that it does not have the power to overrule the *Gordie Boucher* holding, but could "signal [its] disfavor" for the decision and request that this court consider overruling the prior holding. *See Cook v. Cook,* 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997).

provided for by this section shall be made with reasonable consideration . . . of the character of the municipality, town or county with a view . . . for encouraging the most appropriate use of land throughout the municipality, town or county." The court's conclusion is contrary to this clear statutory language.

¶ 35. Moreover, while *Gordie Boucher* cited numerous secondary authorities indicating that zoning and platting are mutually exclusive, and that "use" of land relates only to zoning, it disregarded case law determining that while zoning and platting are different, zoning authority and platting authority are not mutually exclusive. In *Storms,* we determined that certain types of regulations could be accomplished by zoning or by subdivision approval authority:

> As long as the regulation is authorized by and within the purposes of ch. 236, the fact that it may also fall under the zoning power does not preclude a local government from enacting the regulation pursuant to the conditions and procedures of ch. 236.

*Storms,* 110 Wis. 2d at 70–71. Additionally, in *Lake City,* while noting the different authorizations for zoning and platting, we stated that "the authority of the agency assigned to plat review may not be limited by zoning regulations." *Lake City,* 207 Wis. 2d at 173.

¶ 36. We further stated in *Storms,* in comparing zoning and subdivision approval authority, that:

> Zoning presupposes that the needs of the community have become sufficiently crystallized to permit the enactment of specific regulations. *Subdivision control,* on the other hand, *establishes more general standards to be specifically applied* by an administrative body *in order to insure that the change of use will not be detrimental to the community.*

87

*Id.* at 69 (citations omitted) (emphasis added). We thus spoke of subdivision approval authority as essentially regulating the "use" of land.

¶ 37. For these reasons, we conclude, in response to the issue set forth in the certification, that Wis. Stat. ch. 236 does authorize a municipality to reject a preliminary plat under its extraterritorial jurisdictional authority based upon a subdivision ordinance that considers the plat's proposed use. Because *Gordie Boucher* concluded otherwise, its holding must be overruled.

¶ 38. Our conclusion in large part is driven by the plain language of the declaration ˌ of intent in § 236.45(1) which leaves no doubt that subdivision ordinances may consider the proposed use of land. The Woods and the amici argue that such a conclusion is bad policy. The remedy for change of this policy, however, lies with the legislature.[11] The courts should not rewrite the clear language of the statute.

IV

¶ 39. Having determined that subdivision regulations under chapter 236 may consider the use of land, ˌ we turn to the ordinances at issue in this case and their application. The Woods contend that the City of Madison's rejection of their application was arbitrary, unreasonable, or discriminatory. They also advance

_____

[11] The legislature recently enacted new "Smart Growth" legislation, Wis. Stat. § 66.1001, that requires municipalities to adopt comprehensive plans that include land use provisions. *See* 1999 Wis. Act 9. While the parties briefly address its implications, this legislation will not fully take effect until 2010, and does not apply in this case. Wis. Stat. § 66.1001(3).

that the ordinances improperly require the exercise of discretion by the plat approval authority and are impermissibly vague.

¶ 40. The ordinance provisions at issue are part of Madison's "Land Subdivision Regulations" ordinance, which functions to "regulate and control the subdivision of land within the corporate limits and extraterritorial plat approval jurisdiction of the City . . . ." MGO § 16.23. Specifically at issue is Madison's extraterritorial plat approval ordinance, under which "[t]he Plan Commission may recommend or approve the subdividing of lands in the extraterritorial plat approval jurisdiction based on the applicable criteria enumerated hereinafter." MGO § 16.23(3)(c).

¶ 41. The "applicable criteria" depend on whether the land is agricultural or nonagricultural. The extraterritorial plat approval ordinance, MGO § 16.23(3)(c), sets forth only one criterion for agricultural land division: the subdivision must "assist and assure the continuation of the agricultural use." For nonagricultural land, a subdivision or land division must meet each of four criteria. It must: "be compatible with adjacent land uses" and "maintain the general land use pattern of the area"; "result in a development pattern which is compatible with surrounding developments and land uses"; "not demonstrably adversely affect the City's ability to provide public services, install public improvements or accomplish future annexations"; and either constitute "infilling" of vacant land or "provide permanent open space lands for use by the general public."[12] MGO § 16.23(3)(c)2.a.-d.

---

[12] Madison General Ordinance § 16.23(3)(c)1–2 reads:

1. *Criteria for Agricultural Land Division.* The Plan Commission may grant approval of a land division subdividing portions of agricultural lands provided the Commission shall determine that

¶ 42. The City of Madison plan commission determined that the proposed preliminary plat did not sat-

the proposed land division will assist and assure the continuation of the agricultural use.

*2. Criteria for Nonagricultural Subdivision or Land Division.* In the case of nonagricultural lands, the Plan Commission may recommend approval of a subdivision to the Common Council or may grant approval of a land division provided that the Plan Commission shall determine that the proposed subdivision or land division complies with each of the following four criteria:

a. The proposed subdivision or land division shall be compatible with adjacent land uses and shall maintain the general land use pattern of the area in question.

b. The proposed subdivision or land division shall result in a development pattern which is compatible with surrounding developments and land uses. Measures of compatibility shall consider lot sizes, traffic generation, access, noise and visual features.

c. The proposed subdivision or land division and the resulting development shall not demonstrably adversely affect the City's ability to provide public services, install public improvements or accomplish future annexations. . . . The Plan Commission may also consider whether the City and Town(s) have reached an agreement on necessary public improvements and public services facilities required to serve the development.

d. The proposed subdivision or land division shall comply with one of the following:

 i. The proposed subdivision . . . shall represent infilling of vacant land. Infilling is defined as a subdivision . . . which will accommodate the development of vacant land located such that surrounding existing land uses render the land impractical for any but similar uses.

 ii. The proposed subdivision . . . shall provide permanent open space lands for use by the general public in conformance with the adopted Parks and Open Space Plan for Dane County, Wisconsin, the City of Madison adopted Parks and Open Space Plan or the City's other adopted Master Plan elements, including the Peripheral Area Development Plan. . . .

90

isfy the Criteria for Agricultural Land Division. It found that the subdivision did not comply with MGO § 16.23(3)(c)1. because it would not "assist and assure the continuation of agricultural land use on the property" and because "development of nine lots for commercial purposes under the proposed C-2 commercial zoning will result in a loss of most of the agriculturally utilized lands within the boundaries of the proposed preliminary plat."

¶ 43. The plan commission also determined that the subdivision did not meet three of the "Criteria for Non-Agricultural Subdivision or Land Division." Finding that the subdivision did not comply with MGO § 16.23(3)(c)2.a. because it did not maintain the general use patterns of the area, the plan commission stated:

> The undivided property currently consists of agricultural lands . . . . The subdivision of this property to create nine commercial lots does not appear to be compatible with adjacent land uses and [does not] maintain the general land use pattern of the area in question. The development of nine commercial lots will be inconsistent with the remaining conservation easement parcel . . . the remaining agricultural lands . . . in addition to vacant, agricultural, unimproved lands to the west and to the east.

¶ 44. The plan commission also determined that the subdivision did not meet the requirements of MGO § 16.23(3)(c)2.b. because the commercial development was not compatible with surrounding land uses:

> The development of currently agricultural lands for commercial purposes proposed with this preliminary plat would extend the scattering of unplanned, commercial development within the general area . . . . The development of the agricultural lands on this property for commercial purposes will negatively impact the

rural agricultural land uses that will remain on this parcel, as well as adjacent parcels to the immediate east and west.

¶ 45. Finally, the plan commission found that the proposed plat was inconsistent with MGO § 16.23(3)(c)2.d. because the commercial lots would not constitute infill:

> Although there is a scattering of . . . commercial development adjacent to this parcel, the existing agricultural land use on the parcel, combined with the extensive agricultural land uses on properties immediately to the east and west . . . establish the general character of the area. . . . [The area] is largely agricultur[al] interspersed with small, single-family improved lots. The subdivision of the bulk of the agricultural lands that exist on the Wood property would be a significant expansion of commercial land use in this area . . . . The creation of nine commercial lots on a parcel where no commercial activity exists beyond [an] agricultural trucking firm . . . does not support a conclusion that this would be infill development. . . .

¶ 46. The plan commission therefore recommended that the Common Council deny the proposed plat. The Common Council adopted the findings of the plan commission and subsequently rejected the proposed plat.

¶ 47. Like the circuit court, we conclude that the findings in the City of Madison's decision were clearly grounded in the plain language of the non-agricultural criteria of the Madison general ordinances relating to subdivision plat approval. Accordingly, we determine that the City of Madison acted within its authority in rejecting the application and that its actions were not arbitrary, unreasonable, or discriminatory.

92

¶ 48. The Woods claim that platting approval is purely ministerial and that the Common Council's consideration of compatibility of uses was improper because it required an exercise of discretion. However, discretion is granted to municipalities to condition approval on compliance with municipal ordinances. Wis. Stat. § 236.13(1)(b). A city has broad discretion to implement subdivision control if its ordinances comport with the platting statutes. *State ex rel. Columbia Corp. v. Pacific Town Bd.*, 92 Wis. 2d 767, 778, 286 N.W.2d 130 (Ct. App. 1979) (citing *Mequon*, 52 Wis. 2d at 773–74). There is no dispute that if a proposed plat is not in compliance with an existing statutory requirement or ordinance, plat approval authorities may properly reject it. In this case, the City of Madison properly rejected the proposed plat after finding that it was inconsistent with city ordinances.

¶ 49. Finally, the Woods assert that the ordinance provisions and their application by the City of Madison are too vague for Madison to fulfill its administrative responsibilities under the law. The Woods' vagueness argument is premised on the ordinance lacking set standards, resulting in the unauthorized exercise of discretion. Because we have determined above that the City of Madison properly made findings which comported with specific standards set forth in the ordinances, and that the City appropriately exercised its discretion, the Woods' vagueness argument must fail.

¶ 50. Additionally, the Woods' vagueness argument relies on *Columbia Corp.*, 92 Wis. 2d at 774, 779, in asserting that the regulations in the subdivision ordinance fail to give adequate warning as to what the

approving authority would consider in making its decision. *Columbia Corp.* does not support the Woods' position.

¶ 51. The court determined in *Columbia Corp.* that plat approval authorities have no discretion to reject proposed plats "unless the plat conflicts with an existing statutory requirement of ch. 236 or with an existing written ordinance." *Id.* at 779. At the time of the plat rejection in *Columbia Corp.*, there was no existing written ordinance, much less set standards. Here, however, a written ordinance existed which was of long standing, published on the Internet, and available to developers and property owners.[13]

V

¶ 52. In summary, we hold that Wis. Stat. ch. 236 authorizes a municipality to reject a preliminary plat

---

[13] The Woods make an additional argument, claiming that Madison improperly conditioned approval of their proposed plat on a requirement of public improvements. However, if one of Madison's reasons for rejecting the final plat is adequate, the court need not consider whether the other reasons are valid. *See Busse v. City of Madison*, 177 Wis. 2d 808, 813, 503 N.W.2d 340 (Ct. App. 1993). Because we have determined that Madison's rejection of the proposed plat based on the change in use of the land was proper, we need not reach the public improvement issue.

Likewise, we note that although the Woods have not challenged the constitutionality of the procedures set forth in chapter 236, the amicus curiae brief of the Wisconsin Realtors Association argues that due process considerations mandate the use of zoning, not platting, to control land use. Because an argument challenging the procedural provisions in chapter 236 was not argued or preserved by the Woods, we do not address it here.

under its extraterritorial jurisdictional authority based upon a subdivision ordinance that considers the plat's proposed use. We overrule *Gordie Boucher* because it held to the contrary. We also determine that the standards set forth in the subdivision ordinance in this case were neither vague nor applied in an arbitrary, unreasonable, or discriminatory manner. Accordingly, we determine that the City of Madison acted within its authority, and we affirm the circuit court order which upheld Madison's rejection of the Woods' plat.

*By the Court.*—The order of the circuit court is affirmed.

¶ 53. DAVID T. PROSSER, J. *(concurring).* The sole purpose of statutory interpretation is to ascertain the intent of the legislature. *Stockbridge School Dist. v. Dep't of Pub. Instruction,* 202 Wis. 2d 214, 219, 550 N.W.2d 96 (1996). The language and legislative history of Wisconsin's subdivision statutes leave me no choice but to affirm the circuit court on the record in this case. My analysis of the statutes is set out in Sections I-VI of this concurrence.

¶ 54. I write separately because my analysis of the law is different from the analysis in the majority opinion. In particular, there is no need for the court to overrule *Gordie Boucher Lincoln-Mercury v. Madison Plan Commission,* 178 Wis. 2d 74, 503 N.W.2d 205 (1993). As explained in Sections VII and VIII, the majority opinion relies too heavily on selected passages from the broad declarations of policy in the subdivision chapter, as opposed to specific grants of authority in the chapter. It loses sight of the statutory scheme and avoids any effort to harmonize the statutes on extraterritorial subdivision regulation with the statute on extraterritorial zoning. Consequently, the opinion pro-

motes intergovernmental conflict, not intergovernmental cooperation. In addition, the majority opinion fails to digest the extensive background and history of the subdivision chapter or to recognize limits to the content of local subdivision ordinances and extraterritorial planning.

¶ 55. Although the majority opinion is correct in affirming the rejection of the disputed plat, its analysis is at odds with the intent of the legislature. This requires me to disavow both the majority's interpretation of subdivision regulation and its decision to overrule *Gordie Boucher.*

I

¶ 56. Wisconsin has always followed its own course in regulating the subdivision of land. It has differed from states influenced by the Standard City Planning Enabling Act developed by the United States Department of Commerce in 1928. The Standard Act authorized municipal controls over subdivisions, but these controls were more limited than the controls that have evolved in Wisconsin and they maintained a clear distinction between planning and zoning.

¶ 57. Regulating the platting of land has a long history in this state. The first applicable regulations on this subject "are contained in the Laws of Michigan of 1833. Similar provisions are contained in the Revised Statutes of 1839 of the territory of Wisconsin and in the first statutes of the state, Revised Statutes of 1849." 35 Op. Att'y Gen. 437, 439 (1946). As early as 1882 the legislature required that the streets and alleys in new subdivisions be platted to conform to existing streets and alleys. § 1, ch. 52, Laws of 1882.

¶ 58. Chapter 236 of the Wisconsin Statutes, entitled "Platting Lands and Recording and Vacating

Plats," represents the sum of this state's subdivision enactments over the years. The chapter was comprehensively revised in 1955. *See* ch. 570, Laws of 1955. Individual sections of the chapter have been refined since then, and it is the current law that governs this case.

¶ 59. Several of the law's key provisions originated before 1955. For instance, cities have had extraterritorial plat approval authority since 1909. The legislature provided that when land was divided within "one and one-half miles" of a first, second, or third class city, the owner of the land had to "cause the streets and alleys shown on the map . . . to be laid out and platted to the satisfaction of the common council of such cities." § 1, ch. 121, Laws of 1909. Any map or plat that did not receive such approval could not be recorded. *Id.* Extraterritorial plat approval authority is presently found in Wis. Stat. §§ 236.02(5), 236.10(1)(b), and 236.45(3) (1999–2000).[1] The extraterritorial jurisdiction of first, second, and third class cities has been extended to three miles. Wis. Stat. § 236.02(5).

¶ 60. In 1945 the legislature created Wis. Stat. § 236.143, relating to the subdivision of land outside the limits of incorporated cities or villages in counties having a population of 500,000. This section, now repealed, was important, in part because it gave the state's most populous county power to "regulate, restrict, and in specific areas *prohibit* the division or subdivision of land within the county outside the limits of incorporated cities or villages." § 2, ch. 218, Laws of 1945 (emphasis added). The section supplemented the county's already-existing zoning power. *See* Wis. Stat.

---

[1] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

§ 59.97 (1945). Today, municipalities, as well as counties and towns, have authority to "prohibit the division of land" under Wis. Stat. § 236.45(2)(a) when the prohibition will carry out the purposes of this section.

¶ 61. Former section 236.143 also contained a "Declaration of Legislative Intent."[2] Many phrases in this declaration were borrowed from phrases in the zoning statute for cities. See Wis. Stat. § 62.23(7)(a), (c) (1945).[3] Much of the language in that declaration was

---

[2] The 1945 declaration states:

The purpose of this section is to promote the public health, safety and the general welfare of the community and the regulations authorized to be made are designed to lessen congestion in the streets and highways and *further the orderly layout and use of land;* to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate adequate provision for transportation, water, sewerage, schools, parks, playgrounds and other public requirements; to facilitate the further resubdivision of larger tracts into smaller parcels of land. The regulations provided for by this section shall be made with reasonable consideration, among other things, of the character of the county with a view of conserving the value of buildings placed upon land, providing the best possible environment for human habitation, and *for encouraging the most appropriate use of land throughout the county.*

Wis. Stat. § 236.143(1) (1945) (emphasis added).

[3] Wisconsin Stat. § 62.23(7)(a) and (c) read as follows:

(a) Grant of power. For the purpose of promoting health, safety, morals or the general welfare of the community, the council may by ordinance regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes provided that there shall be no discrimination against temporary structures. This subsection and any ordinance,

98

later repeated in present Wis. Stat. §§ 236.01 and 236.45(1) as part of the 1955 revision of chapter 236. One phrase that was repeated is the phrase "further the orderly layout and use of land." The majority heavily relies on the "use of land" passage to support its analysis.[4]

resolution or regulation, heretofore or hereafter enacted or adopted pursuant thereto, shall be liberally construed in favor of the city and as minimum requirements adopted for the purposes stated. It shall not be deemed limitation of any power elsewhere granted.

(c) Purposes in view. Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, of the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and *encouraging the most appropriate use of land throughout such city.*

Wis. Stat. § 62.23(7)(a), (c) (1945).

[4] According to the drafting file on chapter 218, Laws of 1945, the chapter resulted from passage of 1945 Assembly Bill 359, introduced by Rep. Milton F. Burmaster of Milwaukee County. The drafting file shows that the bill was requested by Milwaukee County and was prepared from a draft written by C. Stanley Perry, assistant corporation counsel for Milwaukee County. Reflecting Perry's original draft, the bill stated that one of the purposes of section 236.143 was to "further the orderly layout in use of land." Perry later drafted an amendment to Assembly Bill 359. The amendment changed the language to "orderly layout *and* use of land." *Id.* (emphasis added). This is the history of the "and use of land" language that now appears in Wis. Stat. §§ 236.01 and 236.45(1).

## II

¶ 62. The League of Wisconsin Municipalities maintained an active interest in land use in the early decades of the twentieth century. As an example, in April 1937 the League published an article in its monthly magazine entitled "A Platting Manual For Wisconsin Municipalities," written by Arthur J. Rabuck. Rabuck stated that the purpose of his manual was "to discuss the public interest in land subdivision and methods of promoting and protecting that interest." Arthur J. Rabuck, *A Platting Manual For Wisconsin Municipalities,* The Municipality, Apr. 1937, at 77. Rabuck gave multiple reasons for a growing interest in land subdivision. Among the reasons he listed were the following:

> Premature subdivision of land and the haphazard scattering of homes are certain sources of economic waste due to the enormous costs for water, sewers, drainage, streets, police and fire protection, lighting and other services which will sooner or later be demanded. The large municipalities will also be confronted with the problem of rehabilitating large areas which are being depopulated and are rapidly depreciating in value due to the movement to the outskirts.
>
> . . . .
>
> The revision of the state platting law in 1935 is also a reason for renewed interest in the regulation of the subdivision of land.
>
> Encouragement of local planning and zoning by state and federal governments has resulted in a pronounced interest in planning on the part of local officials. Numerous Wisconsin municipalities are now doing some planning work. *Planning, zoning, and subdivision regulation go hand in hand. Some of the*

*greatest strides in planning accomplishment have been
made by means of control over the subdivision of land.* A
majority of the planning mistakes of the past can be
traced directly to faulty subdivision practices.

*Id.* (emphasis added).

¶ 63. Rabuck urged municipalities to develop
comprehensive plans. He noted the extraterritorial
jurisdiction already existing in the law. He acknowl-
edged that zoning was the most effective way of reserv-
ing land "for its most appropriate use, but in the
absence of zoning regulations much good can be accom-
plished by discouraging the subdivision of land . . . ."
Rabuck, *supra,* at 77–79. Under the heading "Improve-
ments May Be Required," Rabuck wrote that "much
good can be accomplished . . . by requiring the owner or
subdivider to carry more of the burden of his specula-
tive efforts." Rabuck, *supra,* at 79.

¶ 64. The League's interest in subdivision regula-
tion was heightened when Robert D. Sundby served as
its legal counsel in the 1950s.

### III

¶ 65. The University of Wisconsin Law School
was a leading center for the study of land use in the
years before and after the 1955 revision of the subdivi-
sion chapter. This focus was inspired by Professor Jacob
H. Beuscher (1907–1967), a charismatic scholar and
advocate who had a major impact on Wisconsin land use
law. Beuscher influenced generations of lawyers and
planners with his law-in-action theories, as expounded
in the *Wisconsin Law Review* and other publications.

¶ 66. In a memorial edition of the *Law Review*
published after Beuscher's death, then United States
Senator Gaylord Nelson wrote that Beuscher "drafted

the statute creating the Regional Planning Commissions. . . . He completed the monumental task of revising our eminent domain statute. He was the backbone of our long effort to develop wise land use policies in Wisconsin." *In Memoriam Professor Jacob H. Beuscher,* 1967 Wis. L. Rev. 794, 799 (Essay by Gaylord Nelson). In the same issue, Professor Daniel Mandelker wrote that Beuscher:

> always fought for an extension of the public influence over our natural inheritance of land, water, and environment. . . . He taught us that legal principles in the field of land use planning gain meaning only from the context in which they are applied, and that the relationship between the legal structure and the way in which that structure is used is more important than abstract disputation about legal principle that has no contact with reality.

*Id.* at 7 (Essay by Daniel R. Mandelker).

¶ 67. Articles about land use control appeared regularly in the *Wisconsin Law Review* circa 1950. *See, e.g.,* Ronald D. Keberle, Note, *Land Use—Control by Contract,* 1950 Wis. L. Rev. 701; William Rosenbaum, Note, *Control of Land Through Contractual Provisions Designed to Prevent Waste,* 1950 Wis. L. Rev. 716; Leon Fieldman & Robert Junig, Note, *Sales of Land— Platting Approval in Land Divisions,* 1950 Wis. L. Rev. 750. The latter article declared that:

> Private interests, in the creation of land subdivisions, substantially determine the character of a community's development. The creation of new parcels of land is the critical point in determining how the city will grow . . . . If the subdivider's plan is not in accord with community interests, the community is usually barred from rectifying it by prohibitive costs. . . .

> Most serious trouble can be averted if the public interest is represented at the creation of the new subdivision.

Fieldman & Junig, *supra,* at 750.

¶ 68. The student authors argued that both "the quality and quantity of new subdivisions should come under government scrutiny at this initial stage." *Id.* They explained that *quality* "refers to the way in which the land is subdivided, quantity, to how much land is subdivided." *Id.*

¶ 69. The students examined Wisconsin's subdivision statutes and concluded that chapter 236 was not adequate. They stated that "The important requirement for planning is that land-divisions be approved by governing bodies. . . . [G]overnment *approval* should be a condition precedent to *every* new division of land." *Id.* at 757. They argued that the statutes should set standards on which planning bodies could base their approval or disapproval. "Of course, the most important basis for disapproval is a conflict with land use plans." *Id.* at 758.

¶ 70. In the early 1950s, Professor Beuscher undertook a study of subdivision law. Frank L. Bixby, Note, *Wis. Const. Art. VIII, § 1—Partial Exemption of Value as an Inducement to Proper Subdivision,* 1953 Wis. L. Rev. 141, 141 n.2. Shortly thereafter, Beuscher's former student and faculty colleague, Marygold Shire Melli, produced a comprehensive scholarly study entitled *Subdivision Control in Wisconsin,* which made the case for a thoroughgoing revision of Wisconsin's subdivision statutes. 1953 Wis. L. Rev. 389.

¶ 71. On the first page of her 68–page article, Melli explained that:

> Subdivision control, the regulation of the division of raw land into building lots, is a vital component of

land-use control. . . . [C]ontrol of [the subdivision] process has become recognized as an integral part of any land-use planning scheme . . . .

Subdivision control is, of course, only one of the instruments used by a community to regulate the use of privately owned land in the public interest. It is closely related to zoning control in that both are preventative measures intended to avert community blight and deterioration by requiring that new development proceed in defined ways and according to prescribed standards. . . .

[S]ubdivision control is recognized as a legitimate land-use tool . . . .

Marygold Shire Melli, *Subdivision Control in Wisconsin,* 1953 Wis. L. Rev. 389, 389.

¶ 72. So timely and persuasive was Melli's article that the Wisconsin Legislative Council's Judiciary Committee commenced a study on the "Subdivision and Platting of Land." The Legislative Council hired Melli, and its Judiciary Committee created an Advisory Committee on Subdivision and Platting, chaired by Robert D. Sundby, legal counsel for the League of Wisconsin Municipalities.[5] According to the Legislative Council's report to the 1955 legislature, "All sections recommended by the advisory committee were prepared originally by a drafting subcommittee consisting of Mr. Sundby, the chairman of the committee, and M.S. Melli,

_____

[5] Robert Sundby was a 1949 graduate of the University of Wisconsin Law School. He was elected to the Order of the Coif. 1949 Wis. L. Rev. 823. He served on the Wisconsin Law Review with Marygold Shire [Melli] and Daniel Mandelker. 1949 Wis. L. Rev. 5. Like his classmates, he was likely a student of Jacob Beuscher.

the legislative council staff member assigned to the committee." Report of the Wisconsin Legislative Council, Volume IV, *Conclusions and Recommendations of the Judiciary Committee on the Subdivision and Platting of Land,* at 9 (Jan. 1955) (hereinafter 1955 Report).

¶ 73. The Legislative Council report contained a lengthy analysis of the background and deficiencies of the existing subdivision chapter, together with a draft bill with notes accompanying each section.[6] The report set out six explicit objectives of the study and the draft legislation. 1955 Report, *supra,* at 11–23. These included: Objective I: To formulate legislation which would provide some control over the *quality* of subdivision, and Objective V: To evaluate all of the burdens placed upon the subdivider with particular regard to the individual's rights to the use of his land. *Id.* (emphasis added).

¶ 74. Although the report did not emphasize municipal control over land use in adjacent unincorporated land, it acknowledged that "[c]ontrol over the way in which a land owner divides up his land, i.e., control over

---

[6] The 1955 Report stated that "the committee was very fortunate in having the advice and assistance of an advisory committee consisting of representatives of a number of organizations interested in the subject matter of the study." Preface to the Report of the Wisconsin Legislative Council, Volume IV, *Conclusions and Recommendations of the Judiciary Committee on the Subdivision and Platting of Land,* (Jan. 1955). Wisconsin towns did not have an official representative on the advisory committee. The report further stated that "there were a number of individuals who attended committee meetings and contributed much to the committee considerations." *Id.* Professor J.H. Beuscher of the University of Wisconsin Law School was listed among these individuals. *Id.*

the type of development he may make, is one of the most contested areas of subdivision control." *Id.* at 12. The report stated:

> Minimum standards for the *quality* of subdivisions raise an important question regarding the extent of control. If the subdivision statute is intended to control land use development, then it follows theoretically that perhaps all divisions of land, at least those which create parcels big enough to be built upon, should be controlled. . . .
>
> Under present law, local units of government may control all divisions of land. § 236.143(2) of the present law grants power to them to regulate the division or subdivision of land. . . .
>
> The committee recommends that the present law be retained, i.e., that the local units of government have the option of controlling all land divisions. See § 236.45 of the proposed revision. . . .
>
> The committee also recommends changes in the definition of subdivision which should increase the extent of control of the state statute to a limited degree. . . . The committee recommends 2 changes in this definition: an increase from one to 5 years in the time involved and an enlargement of the purpose of division to sale or building development.

*Id.* at 14–15 (emphasis added).

¶ 75. The Legislative Council bill was introduced as Senate Bill 20. Robert Sundby and Jacob Beuscher testified in both houses in support of the bill. Senate Bill 20 passed with few changes to become Chapter 570, Laws of 1955.

## IV

¶ 76. Chapter 236 of the statutes was amended by four different bills in the 1957 session of the legislature. Chapters 88, 237, 245, & 599, Laws of 1957. These were the first of many refinements to the chapter following the comprehensive revision in 1955. Among the first changes was an amendment to condition a municipality's extraterritorial jurisdiction on its adoption of a "subdivision ordinance or an official map." *See* § 2, ch. 599, Laws of 1957; Wis. Stat. § 236.10(1)(b)2.

¶ 77. In 1959 Marygold Melli co-authored a law review article with planner Robert S. Devoy. The article was entitled *Extraterritorial Planning and Urban Growth*, 1959 Wis. L. Rev. 55. Melli explained that "preparation for the future growth of the community is called land use planning; it should consist not only of the plans and policies for the future, but also of the means to protect those plans." *Id.* at 55.

¶ 78. Extraterritorial planning controls are "powers given to cities and villages providing them with some control over the type of development in unincorporated areas on their immediate fringe." *Id.* at 56. This is an unusual type of power, she reasoned, "since a municipal corporation is generally required to act within its own boundaries." *Id.*

> Ideally, if extraterritorial planning is to be fully effective it should embrace all the controls available to the community. Therefore, it should be based upon a comprehensive, enforceable master plan and should include the power to zone, to control subdivision, to establish building setbacks, and to protect plans for future streets, playgrounds, parks and other recreational facilities.

> In Wisconsin, a municipality may adopt a master plan covering any area beyond the municipal bound-

aries related to the development of the municipality. In addition, specific grants of extraterritorial power have been made by the legislature for subdivision approval and official maps to cover certain limited areas. *Zoning remains the major field in which no extraterritorial power has been granted.*

*Id.* (emphasis added).

¶ 79. Melli argued in favor of extraterritorial zoning. "The principal shortcoming of extraterritorial controls in Wisconsin results from the fact that there is no extraterritorial zoning authority. The power to zone, to control the actual use to be made of the land, is probably the most important single land use control." *Id.* at 66.

¶ 80. Melli acknowledged that "the power to control new subdivisions and to map new streets is much less effective" without a concomitant power to zone. *Id.* Nonetheless, she stated that the right to approve the way in which undeveloped land is divided for urban use was one of the most important powers a municipality possessed. *Id.* at 59. She noted that cities "may exercise subdivision control for 3 miles outside their corporate limits." *Id.* "The principal limitation on subdivision approval as a land use control is its territorial scope." *Id.* at 60.

¶ 81. Melli's article was accompanied by an article by Robert D. Sundby entitled *The Elimination and Prevention of Urban Blight,* 1959 Wis. L. Rev. 73. In the course of his article, Sundby stated that among the factors that contribute to urban blight are "the overcrowding of land, poor layout and use of land, and inadequate provision for water, sewerage, and drainage." *Id.* at 92. "These factors may be controlled by the adoption and enforcement of adequate subdivision regulations." *Id.* He added:

The state law regulates only subdivisions where the act of division creates 5 or more parcels or building

108

sites of 1 1/2 acres or less in area, or where 5 or more such parcels are created by successive divisions within a period of five years. The state law is therefore subject to considerable evasion through the process of division and redivision. However, the statute authorizes cities, villages, towns, and counties to adopt local subdivision ordinances, provides that such ordinances may include provisions regulating divisions of land into parcels larger than 1 1/2 acres or divisions of land into less than 5 parcels. Thus, municipalities are given ample authority to control any division whatsoever for purposes of sale or building development.

*Id.* at 92–93.

¶ 82. In the years following the 1955 revision of chapter 236, the Legislative Council's Urban Problems Committee studied the need for additional land use controls in unincorporated areas. Part of this discussion was recounted later by then court of appeals Judge Robert D. Sundby in *Gordie Boucher Lincoln-Mercury v. Madison Plan Commission,* 178 Wis. 2d 74, 503 N.W.2d 205 (1993). Writing for the court, Sundby noted that the legislature had approved a statute on extraterritorial zoning, Wis. Stat. § 62.23(7a). *See* ch. 241, Laws of 1963. However, that statute did not give a municipality unilateral authority to zone land in an unincorporated town within the municipality's extraterritorial jurisdiction. Rather, the statute "require[d] that extraterritorial zoning be a cooperative effort of the city plan commission and the town in which the zoning ordinance will be in effect." *Gordie Boucher,* 178 Wis. 2d at 100–101. Judge Sundby wrote that the Urban Problems Committee "rejected a proposal giving populous counties authority to adopt comprehensive zoning ordinances which would apply throughout the unincorporated areas without the approval of the individual

towns." *Id.* at 101. Hence, he concluded, "[w]hile ch. 236 . . . and sec. 236.45 . . . confer broad regulatory authority upon local governing bodies, that authority relates to the *quality* of the subdivision or land division and not to the use to which the lots in the subdivision or land division may be put." *Id.* (emphasis added).

V

¶ 83. In 1967, the year that he died, Professor Beuscher authored a remarkable summation of his views on "Land Use Controls." His report, which was published as part of the Wisconsin Development Series by the Wisconsin Department of Resource Development, focused on legal means to achieve land use planning goals. Beuscher spelled out his law-in-action philosophy with disarming candor:

> [M]any planners and lawyers tend to compartmentalize governmental powers first into the major areas of: power of eminent domain, power of taxation, power of appropriation, and police power. Then the major plan implementation police power tools, such as zoning, subdivision control, and official mapping, are broken out and often dealt with as if they existed apart from the whole fabric of governmental power. So that comprehensive areawide planning may be successfully implemented, the entire range of police power controls must be effectively coordinated one with another . . . to deal in the public's interest. In short, a more unitary concept of the entire range of sovereign powers of the state must be developed.

J.H. Beuscher, *Land Use Controls* I-1 (Dep't of Res. Dev., Wis. Dev. Series, 1967).

¶ 84. Professor Beuscher took pains to educate his readers on the scope of land use planning goals, including *placement* of development and *pacing* of de-

velopment, as well as the preservation of open space. *Id.* at I-2. "It seems clear," he wrote, "that the placing of development and the control of alternative uses of land are necessary from an economic standpoint to insure the wisest use of scarce resources and adequately to protect the health, safety and general welfare of the community." *Id.* at I-3. "Governmental services and facilities must be provided to each new subdivision and to each new resident of the community. Since there is a limit to the availability of tax dollars . . . the pacing of development becomes critically important in rapidly growing urban regions. . . . [T]he process of growth must be paced over time." *Id.*

¶ 85. Beuscher pointedly advocated many changes in the planning statutes to effect more complete control of development. But in the absence of such changes, he urged tough-minded utilization of the tools at hand. "The time for a return to simple fundamentals is long overdue. The focus should not be on the niceties, the subtleties, the particular limitations and potentials of individual legal tools. The focus should be on the accomplishment of the community objectives themselves as expressed in properly prepared development plans." *Id.* at II-2. Why "must it be one control tool *or* another or one government power *or* another?" he asked. "Why not greater use of two or more in combination?" *Id.* at II-3.

¶ 86. In Section IV of his Report, Beuscher discussed the Master Plan—the "physical plan" contemplated in Wis. Stat. § 62.23(2). Then he asked:

Is a master plan a mere guide to the local planning agency and governing body, or is it in some respects in and of itself a legally binding land use control?

Wis. Stat. § 62.23, reflecting the philosophy of the Standard Planning Act of 1928, seems on its face to

contain the answer when it provides in subsection (3) that: "The purpose and effect of the adoption and certifying of the master plan or part thereof shall be solely to *aid* the city plan commission and the council in the performance of their duties." The fact that no public hearing on the proposed master plan is required and that it need be approved only by the plan commission and not by the local legislative body seems to be further evidence that the plan is intended only for informal guidance, not for regulatory control.

Nevertheless, from the outset adoption of a master plan has had one regulatory effect. Once the plan is adopted by the plan commission, the local governing body may not act finally on a variety of specified public improvement projects until the matter has first been referred to the plan commission and until the commission after consideration has reported.

In rewriting Wis. Stats. Chapter 236, the subdivision code, in 1955, the Legislature provided:

> Approval of the preliminary or final (subdivision) plat shall be conditioned upon compliance with: . . . (c) any local master plan or official map; . . .

The extent or validity of the requirement that a subdivision plat comply with a local master plan has not been tested before the Wisconsin Supreme Court. Involved is the technical issue of whether the Legislature intended to delegate to the plan commission a legislative and a regulatory function so far as concerns master plans. If the Legislature had this intention, was the delegation valid under the 14th Amendment of the Federal Constitution, which imposes an obligation on states that property not be taken "without due process of law."

Beuscher, *supra,* at IV-23.

¶ 87. Beuscher counseled that it would "strengthen [the case for the plan] if the local governing body indicated its approval of the master plan." *Id.* "Undoubtedly, also as a practical matter, it would help to show that, though not required by the statute, a public hearing on the proposed master plan was, as a matter of fact, held after due notice before either the plan commission or the governing body or both." *Id.*

¶ 88. Returning to subdivision regulation, Beuscher emphasized that besides zoning, "[a] subdivision control ordinance is another important device which can be used to regulate and order the placing of development." *Id.* at VII-13.

> The private developer seeks the benefit of recording his lots for ease of sale; he contemplates that the public will assume the long-run maintenance of streets, sewers, and water lines; he will undoubtedly affect the community tax base and alter existing governmental service functions and their costs; and the initial decisions of location, lot size, street width, type of housing, will undoubtedly establish an indelible pattern of land use that will affect the community for generations to come. In addition, the state is interested in secure real estate descriptions to prevent fraud and conflict; and mortgage lenders are interested in the long-term stability of the new neighborhood which is being established. *For any or all of these reasons, the body public is justified in regulating the process of subdividing and in establishing those reasonable conditions upon which plat approval will be granted.*
>
> . . . *Difficulties arise in determining what are reasonable conditions. . . .* Courts will be moved to accept those conditions which sound planning and empirical and analytical evidence justify. *They will reject those conditions which appear to overreach, rely*

*on erroneous or incomplete data, or which are simply stalling tactics designed to slow down or prevent development.*

. . . Theoretically, one could argue that all costs associated with the development should be borne by the private developer and passed on to his buyers, who after all are seeking to profit from his decision to subdivide. There should be no hidden subsidy to the developer or to his buyers in the form of community absorption of development costs. *Practically, it is not possible to push the conditions for plat approval this far.* First of all, it is often very difficult to determine the true costs of development. *After the major cost items of street, water, and sewer have been settled,* cost determination can become a very speculative process. . . . Therefore, the conditions imposed for plat approval must be reasonable; but the definition of reasonableness may be expanded by comprehensive planning and the presentation of data that justify the particular challenged set of conditions or condition.

*Id.* at VII-13, 14 (emphasis added).

## VI

¶ 89. Today, to entitle the plat of a subdivision within the extraterritorial plat approval jurisdiction of a municipality to be recorded, it must have the approval of (1) the town board, (2) the governing body of the municipality (if the municipality has adopted a subdivision ordinance or an official map), and (3) the county planning agency. Wis. Stat. § 236.10(1)(b).

¶ 90. A landowner seeking to subdivide land submits a proposed plat to all authorities whose approval is required. Wis. Stat. §§ 236.11, 236.12. Approval of the preliminary or final plat *shall be conditioned upon compliance with:* (a) the provisions of chapter 236, (b) *any municipal,* town or county *ordinance,* and (c) a

comprehensive plan. Wis. Stat. § 236.13(1). The law was slightly different before January 1, 2000. The former subsection (c) required compliance with any local master plan consistent with any plan adopted under Wis. Stat. § 236.46 or official map adopted under Wis. Stat. § 62.23.

¶ 91. Wisconsin Stat. § 236.11(1)(b) contains the flip side of Wis. Stat. § 236.13(1). It provides that if "the final plat *conforms* substantially to the preliminary plat as approved . . . *and to local plans and ordinances adopted or authorized by law,* it is entitled to approval." Wis. Stat. § 236.11(1)(b) (emphasis added).[7] Implicit in this formulation is a counter principle: If a plat does not conform to local plans and ordinances adopted as authorized by law, it is not entitled to approval.

¶ 92. The purpose of subdivision regulation is broadly stated in Wis. Stat. §§ 236.01 and 236.45(1) and includes "to further the orderly layout and use of land."[8] Wis. Stat. §§ 236.01, 236.45(1).

¶ 93. Local governments are authorized to adopt "ordinances governing the subdivision or other division of land which are *more restrictive* than the provisions of this chapter." Wis. Stat. § 236.45(2) (emphasis added). These "more restrictive" ordinances apply to divisions and subdivisions of land in a municipality's extraterritorial plat approval jurisdiction. Wis. Stat. § 236.45(3).

¶ 94. A "more restrictive" ordinance may apply to *any* division of land, either greater than or less than 5 parcels. Wis. Stat. § 236.45(2)(a). It may "prohibit the

---

[7] The language on "local plans and ordinances" was added to the law by a Dane County legislator, Representative Jonathan Barry, in 1980. *See* ch. 238, Laws of 1979.

[8] For the history of this language, see footnote 3 of this concurrence.

division of land" in areas where such prohibition will carry out the purposes of the section. *Id.* Wisconsin Stat. § 236.45 and any subdivision ordinance adopted under it "shall be liberally construed in favor of the municipality . . . and shall not be deemed a limitation or repeal of any requirement or power granted or appearing in this chapter or elsewhere, relating to the subdivision of lands." Wis. Stat. § 236.45(2)(b).

¶ 95. Given the plain language of the chapter and the extensive legislative history behind this language, it cannot reasonably be argued that Madison violated either the letter or the spirit of the statute when it failed to approve the Woods' plat. The Woods' land was and still is zoned as agricultural land. Both this land and much of the surrounding land are still used as agricultural land. Thus, the *proposed* commercial use of the Woods' land is in fact inconsistent with the City's master plan. Moreover, the City raised legitimate *quality* questions about the provision of sewers and the adequacy of roads if the land were put to commercial use. In short, the proposed subdivision violated the City's master plan *and* its subdivision ordinance. The Woods are not in a position to challenge Madison's subdivision ordinance *as applied* because their position is so vulnerable to criticism. The City was not overreaching in this case.

## VII

¶ 96. Clearly, the City of Madison has adopted the strategy suggested by Professor Beuscher and utilized every possible tool short of extraterritorial zoning to enforce its position on land use planning. It has adopted a very far-reaching subdivision ordinance. The legisla-

ture has directed courts to liberally construe this ordinance and similar ordinances, as well as all the provisions of chapter 236.

¶ 97. There is a point, however, at which the legislature's grant of authority to Madison and other municipalities to actually *control* land use extraterritorially comes to an end, unless these municipalities have exercised lawful authority to zone the land. The court of appeals concluded in the *Gordie Boucher* case that this point had been reached.

¶ 98. In *Gordie Boucher*, the City of Madison Plan Commission was asked to approve a certified survey map (CSM) of a land division in Madison's extraterritorial plat approval jurisdiction. It refused to do so on grounds that Gordie Boucher's plans for an automobile dealership on a proposed 12.2 acre site on part of the subdivided property was inconsistent with the City's Peripheral Area Development Plan, which created a Permanent Open Space District. *Gordie Boucher*, 178 Wis. 2d at 80–82.

¶ 99. The court of appeals explained that the proposed Gordie Boucher land was part of a 41.25 acre parcel that was being subdivided into four lots. The specific lot in question was adjacent to U.S. Highway 151 on the west and to an established landfill on the east. *It had been zoned C-2 commercial for more than 30 years. Id.* at 82. The town of Burke had conditionally approved the CSM and the Dane County Zoning and Natural Resources Committee had conditionally approved the CSM. *Id.* at 82–83. But the Madison Plan Commission balked and rejected the CSM. *Id.* at 83.

¶ 100. Although the Plan Commission gave five reasons for its action, the essence of its disapproval was that (1) the proposed survey was not consistent with the City's Master Plan, including the Peripheral Area

Development Plan, the Land Use Plan, and the Parks and Open Space Plan, and (2) the certified survey map was inconsistent with the Plan Commission's policy for agriculture and non-agriculture land divisions. *The Plan Commission relied exclusively on the master plan rationale when the case reached the court of appeals. Id.*

¶ 101. The circuit court, Moria Krueger, Judge, rejected the City's reasons on grounds that Madison was effectively attempting to rezone the lot to agriculture through planning and subdivision ordinances when the lot had been zoned commercial for many years. The circuit court ruled that the City's Master Plan could not override Dane County's zoning ordinance. *Id.* at 90.

¶ 102. The court of appeals agreed. In a unanimous opinion written by Judge Sundby, the court ruled that:

> [T]he legislature has not given the city's master plan, a planning tool, pre-eminence over county zoning, a regulatory tool. . . . There is no authority for the commission's contention that a county zoning ordinance is subordinate to the city's master plan. We reject the commission's contention; it has no support in the statutes or case law.

*Id.* at 90–91.

¶ 103. This analysis was and is unassailable. It does not require reliance on treatises unrelated to the peculiarities of Wisconsin law. It is fundamental Wisconsin law.

¶ 104. There can be no dispute that the legislature has given Wisconsin municipalities *expansive* subdivision regulatory powers to encourage broad land use objectives and sometimes to enforce them. It has given municipalities substantial planning authority, even be-

yond three miles of the municipality. But it has not authorized municipalities to—in effect—rezone land by means of extraterritorial subdivision regulation and/or extraterritorial planning. It has not given municipalities power to veto uses of land that are consistent with lawful existing zoning, absent reasonable quality concerns or subdivision defects. That is what *Gordie Boucher* held, and there is no reason to overrule the case.

¶ 105. The very existence of extraterritorial zoning, as set out in Wis. Stat. § 62.23(7a), constitutes a clear expression of legislative intent. This court is not at liberty to ignore the mechanism the legislature has designed for extraterritorial zoning.[9]

---

[9] Wisconsin Stat. § 62.23(7a) establishes exacting, special procedures by which a city may zone land in its extraterritorial zoning jurisdiction. In addition to complying with any applicable general zoning requirements found in § 62.23(7), a city's governing body must, by adoption of a resolution that specifies the area to be zoned, promptly declare through precise notice requirements its intention to prepare a comprehensive zoning ordinance. Wis. Stat. § 62.23(7a)(a).

More important, when a city plan commission formulates a zoning restriction, a joint extraterritorial zoning committee is established. This committee consists of three members of the city plan commission *and* three town members from any town affected by the proposal. Wis. Stat. § 62.23(7a)(c). The joint committee prepares the zoning plan and regulations, or amendments thereto, in conjunction with the city plan commission. *Id.* However, only the members of the joint committee may vote on matters relating to the extraterritorial zoning plan and regulations. *Id.* Accordingly, "The governing body shall not adopt the proposed plan and regulations, or amendments thereto, unless [the proposals] receive a favorable vote of a majority of the 6 members of the joint committee." *Id.* In short, the statute enables the governing body of a city to adopt only zoning that

## VIII

¶ 106. The majority opinion heavily relies on selected passages in two legislative declarations of policy to support its conclusion that a municipality may control the ultimate use of land in its extraterritorial plat approval jurisdiction through the rejection of new plats. In particular, the majority points to the following language: (1) The purpose of chapter 236 and the purpose of section 236.45 is, in part, "to further the orderly layout and use of land." Majority op., ¶¶ 13, 17 (quoting Wis. Stat. §§ 236.01 and 236.45(1), respectively); (2) "The regulations provided for by this section shall be made with reasonable consideration . . . of the character of the municipality, town or county . . . for encouraging the most appropriate use of land." Majority op., ¶ 17 (quoting Wis. Stat. § 236.45(1)).

¶ 107. This reliance is suspect for several reasons. First, sections or subsections that are labeled as declarations of purpose or declarations of legislative intent are different from sections or subsections that clearly

---

has been recommended by the joint committee, and only after public notice and a public hearing on the proposal. § 62.23(7a)(e).

As a practical matter, the statute provides that a town's land may not be zoned extraterritorially unless at least one representative of the affected town concurs with a city's proposed plan or regulations. No unilateral action by the city is permitted. Had the City of Madison attempted to *rezone* land within the Woods' plat by exercising its subdivision regulation authority, without undergoing the processes of § 62.23(7a), it would necessarily have contravened both the letter and the spirit of this specific, enabling statute. The harmonization of a city's extraterritorial subdivision authority with these extraterritorial zoning provisions was respected by the *Gordie Boucher* decision, but ignored by the majority in this case.

grant power. As an example, Wis. Stat. §§ 236.01 and 236.45(1) should be compared to Wis. Stat. § 62.23(7)(a), a provision which clearly grants power.

¶ 108. Second, the language in the declarations is conditional language. To illustrate, both declarations list a purpose to "further the orderly layout and use of land." To "further" something is to "help the progress of" or "advance" something. *The American Heritage Dictionary of The English Language* 737 (3d ed. 1992). It does not imply control of something. Moreover, the word "orderly" modifies "use," just as "orderly" modifies "layout." Furthering the orderly use of land is different from controlling the use of land.

¶ 109. Looking at the other language relied upon, we see the terms "reasonable consideration" and "encouraging the most appropriate use of land." "Reasonable" implies that not all "consideration" will pass muster. "Encourage" is a conditional verb like "further," different from "control" or "effect." These words do not connote the unlimited subdivision regulatory authority the majority appears to embrace. This is especially evident when all the passages relied upon are returned to the context from which they have been taken.[10]

¶ 110. Third, the very existence of conditional words in the declarations recognizes the limits on subdivision regulation and the need to harmonize it with zoning, both extraterritorial and otherwise. Zoning, like subdivision regulation, is an exercise of the police power. When a municipality is given statutory

---

[10] "[I]t is . . . well established that courts must not look at a single, isolated sentence or portion of a sentence, but at the role of the relevant language in the entire statute." *Alberte v. Anew Health Care Servs.,* 2000 WI 7, ¶ 10, 232 Wis. 2d 587, 605 N.W.2d 515 (citing *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51 (1987)).

authority to pass a subdivision ordinance to "promote the public health, safety, and general welfare of the community"—words reflective of the police power—the municipality is not thereby given authority to include explicit zoning in the subdivision ordinance.

¶ 111. The certified question before this court is stated by the majority: "Does Wis. Stat. ch. 236 authorize a municipality to reject a preliminary plat under its extraterritorial jurisdictional authority based on a subdivision ordinance that considers the plat's proposed use?" Majority op. at ¶ 2. The key word in this question is "reject." The obvious answer to the question is "sometimes," depending upon the facts and whether the rejection is "reasonable." There is no absolute "yes" or "no" answer. A municipality may not seek to compel a particular land use that contradicts a validly enacted zoning ordinance by arbitrarily rejecting a plat under the extraterritorial component of its subdivision ordinance. This is the core teaching of the *Gordie Boucher* case.[11]

¶ 112. "Consider" is not the key word in the certified question. The majority opinion observes that "any regulation relating to the 'quality' of a subdivision must necessarily *consider* 'the most appropriate use' of land. We cannot fathom how an ordinance can *consider* the most appropriate use of land if it cannot *consider* the use of land." Majority op. at ¶ 30 (emphasis added). Of course, a platting authority may *consider* the use of land, but it may not impose an authorized end by an

---

[11] A municipality may condition its approval of a plat on the plat's compliance with the municipality's master plan, but the municipality may not enforce a master plan that exceeds its authority. In addition, a municipality may not block an otherwise valid subdivision until, say, the subdivider donates 75 percent of the land to the public.

unauthorized means. The certified question is not the correct question because it is not a question susceptible to a precise answer.

¶ 113. Judge Robert Sundby was an architect of the Wisconsin subdivision statute. He was a zealous advocate of municipalities. The majority's failure to acknowledge Judge Sundby's pivotal role in reforming chapter 236 of the Wisconsin Statutes is surprising. In *Gordie Boucher*, Judge Sundby faithfully applied the provisions of chapter 236, including Wis. Stat. § 236.45 in pari materia with Wis. Stat. § 62.23(7a).

¶ 114. Even scholars who have sought to minimize the distinction between subdivision control and zoning have understood and respected the distinction. Marygold Melli wrote forthrightly that "Zoning relates to the type of building development which can take place on the land; subdivision control relates to the way in which the land is divided and made ready for building development." Melli, *Subdivision Control in Wisconsin,* 1953 Wis. L. Rev. 389, 389.

¶ 115. Professor Beuscher, a tireless advocate for land use planning, nonetheless was careful to recognize property rights:

> Though planning and plan implementation of necessity focus on public needs and desires, it is important to be aware of and understand private property rights which exist and are protected by both the federal and state constitutions. The goal of the courts as arbiter between the public actions which are in conflict with or encroach upon alleged private property rights has been to strike a balance—a balance which will on one hand allow needed public programs to be carried out and at the same time preserve as large a sphere as possible within which the private decision-maker and private property rights may be exercised.

123

Beuscher, *Land Use Controls, supra,* at I-2.

¶ 116. Beuscher also wrote that "it must be conceded that literal application of the requirement that the subdivision comply with the approved master plan would violate the 14th Amendment in some instances . . . because the regulatory impact on the particular landowner [would be] so great as to constitute an invalid taking of property in his case." *Id.* at IV-23. "If the plan commission stands pat and refuses to approve the plat and the council does not buy or condemn the land, the owner may be left in the position of not being able to earn a fair return on his land; and a court would probably declare the *application* of the master plan unconstitutional." *Id.* (emphasis added). A subdivision ordinance may be unconstitutional *as applied* to specific facts.[12]

¶ 117. The City of Madison has repeatedly shown hostility to unapproved development in its extraterritorial plat approval jurisdiction. Consequently, a subdivider in Madison's extraterritorial jurisdiction will have to submit meticulous quality plats if it hopes to prevail in the face of City opposition.

¶ 118. I am authorized to state that JUSTICE JON P. WILCOX and JUSTICE DIANE S. SYKES join this concurrence.

---

[12] The Woods have not advanced an argument relating to the constitutionality of Madison's rejection of their plat and, therefore, the parties did not brief this issue.