Gene L. OLSTAD, Individually and on
Behalf of All Others Similarly Situated,
Plaintiff-Appellant,

v.

MICROSOFT CORPORATION, a foreign corporation,
and Does 1 through 100, inclusive,
Defendants-Respondents.

Supreme Court

*No. 2003AP1086. Oral argument September 22, 2004.*
*—Decided July 13, 2005.*

2005 WI 121

(Also reported in 700 N.W.2d 139.)

For the plaintiff-appellant there were briefs by *John F. Maloney* and *McNally, Maloney & Peterson, S.C.,* Milwaukee and *Ben Barnow* and *Barnow and Associates, P.C.,* Chicago, IL, and oral argument by *John F. Maloney.*

For the defendant-respondent there were briefs by *W. Stuart Parsons, Jeffrey Morris, Brian D. Winters, Kelly*

227

*H. Twigger,* and *Quarles & Brady LLP,* Milwaukee; *David B. Tulchin, Jeremy T. Kamras, Ryan C. Williams* and *Sullivan & Cromwell, LLP,* New York, NY; *Charles B. Casper* and *Montgomery, McCracken, Walker & Rhoads LLP,* (of counsel), *Philadelphia, PA; and Thomas W. Burt, Richard J. Wallis, Steven J. Aeschbacher (of counsel)* and *Microsoft Corporation,* Redmond, WA, and oral argument by *David B. Tulchin.*

An amicus curiae brief was filed by *Stephen E. Meili, Peter C. Carstensen* and *Susan LaCava* and *Susan LaCava S.C.,* Madison, on behalf of the University of Wisconsin Law School Consumer Law Litigation Clinic, Professor Peter C. Carstensen of the University of Wisconsin Law School, and Susan LaCava, Esq.

An amicus curiae brief was filed by *John J. Prentice, Andrew T. Phillips* and *Prentice & Phillips, LLP,* Milwaukee; *Richard M. Hagstrom* and *Zelle, Hofmann, Voelbel, Mason & Gette LLP,* Minneapolis, MN, on behalf of Wisconsin Counties Association.

An amicus curiae brief was filed by *H. Dale Peterson* and *Stroud, Willink & Howard, LLC,* Madison; *William L. Oemichen,* Madison; *Gary Bakke* and *Bakke Norman SC,* New Richmond; on behalf of Wisconsin Farm Bureau Federation, Cooperative, Wisconsin Federation of Cooperatives and Wisconsin Agri-Service Association.

An amicus curiae brief was filed by *Gerald Thain, University of Wisconsin Law School,* Madison, and *James May, Washington College of Law/American University of Law School,* Washington, D.C., on behalf of the American Antitrust Institute.

An amicus curiae brief was filed by *Peggy A. Lautenschlager,* attorney general and *Eric J. Wilson,* assistant attorney general, on behalf of the Wisconsin Department of Justice, and oral argument by *Eric J. Wilson.*

¶ 1. DAVID T. PROSSER, J.   Gene L. Olstad (Olstad), suing individually and as class representative of all others similarly situated, appeals from a final order of the Circuit Court for Milwaukee County granting Microsoft Corporation's (Microsoft) motion for summary judgment and dismissing Olstad's action alleging that Microsoft employs monopolistic practices prohibited by Wis. Stat. § 133.03 (2001–02).[1] The circuit court dismissed Olstad's complaint because it found that Chapter 133 of the Wisconsin Statutes applies only to intrastate commerce. We reverse the circuit court's order because we conclude that Wisconsin's antitrust statutes may reach interstate commerce if (1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside Wisconsin; or (2) the conduct complained of "substantially affects" the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state.

## I. FACTS AND PROCEDURAL POSTURE

¶ 2.   Olstad,[2] seeking to represent a class of Wisconsin consumers,[3] alleges that Microsoft controls a

---

[1] All subsequent references to the Wisconsin Statutes are to the 2001–02 edition unless otherwise indicated.

[2] There is a question whether Olstad is a proper class representative. At oral argument, Olstad's counsel asserted that if this court reversed the circuit court's order, he would substitute a new class representative. Because the circuit court ultimately dismissed Olstad's complaint, it never addressed the issue of whether to certify the class. We need not reach the issue for the purposes of determining this appeal.

[3] Olstad asserts that the class consists of "all persons or entities in the State of Wisconsin who purchased for purposes

229

"dominant and persistent share" of the market for Intel-compatible[4] personal computer operating systems. In 1985 Microsoft introduced its "Windows" operating system. In the following years, Microsoft released newer—and increasingly dominant—versions of Windows. Olstad alleges that Microsoft's Windows market share has "at times exceeded ninety-five percent."

¶ 3. Olstad claims that Microsoft's dominant market share acts as a barrier to entry for would-be competitors. He alleges that Microsoft has created a continuously increasing feedback loop: that is, because "everyone" uses Windows, all new consumers must also buy Windows. In Olstad's view, this feedback loop has become a vicious cycle for consumers. He claims that Microsoft has engaged in various forms of anticompetitive conduct to maintain its monopoly, including actively discouraging competitors from "encroaching upon its operating system monopoly."

¶ 4. In 2000 a United States District Court in the District of Columbia accepted most of these arguments. *United States v. Microsoft Corp.*, 97 F. Supp. 2d 59 (D.D.C. 2000) (final judgment); *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000) (conclusions of law); *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) (findings of fact). Olstad directs our attention to the District Court's findings for "the details of Microsoft's and its co-conspirators' conduct."

¶ 5. In its "conclusions of law," the District Court found that Microsoft's conduct violated the federal Sherman Act "sufficient to meet analogous elements of

other than re-sale or distribution during the last six years, Microsoft licensed Intel compatible PC operating systems." The class does not include government entities. *Id.*

[4] "Intel" is a brand of microprocessor commonly used in personal computers.

causes of action arising under the laws of each plaintiff state," one of which was Wisconsin. *Microsoft,* 87 F. Supp. 2d at 54. Microsoft argued that "a plaintiff cannot succeed in an antitrust claim under the laws of . . . Wisconsin without proving an element that is not required under the Sherman Act, namely, *intrastate* impact." *Id.* at 55. The court rejected Microsoft's argument, concluding that even if a state like Wisconsin had such a requirement, "that element is manifestly proven by the facts presented here." *Id.* The court was "compel[led]" to the conclusion that "Microsoft's anticompetitive conduct has substantially hampered competition" in Wisconsin. *Id.* Accordingly, the court found that Microsoft violated Wis. Stat. § 133.03. *Id.* at 56.

¶ 6. Microsoft appealed, and the United States Court of Appeals for the D.C. Circuit affirmed that part of the District Court's decision holding that Microsoft committed monopoly violations. *United States v. Microsoft Corp.,* 253 F.3d 34, 51 (D.C. Cir. 2001). The court of appeals remanded the case for further findings on other issues. *See id.* at 95.

¶ 7. Olstad alleges that as a result of Microsoft's anticompetitive conduct, Wisconsin consumers have paid artificially high prices for Microsoft products over the past six years. He argued to the circuit court that Microsoft's conduct violated Wis. Stat. § 100.18 (prohibiting unfair trade practices) and Wis. Stat. § 133.03 (prohibiting unlawful contracts and conspiracies).

¶ 8. Microsoft denied these allegations and moved for summary judgment. Microsoft noted that it is a foreign corporation, not organized under the laws of Wisconsin, and its principal place of business is not in Wisconsin. It is undisputed that most of the conduct complained of occurred outside Wisconsin and affected interstate commerce. Microsoft argued that Wisconsin

231

courts have consistently held that Wisconsin's antitrust law, Chapter 133, does not apply to conduct that primarily affects interstate commerce. Microsoft also argued that Olstad failed to state a claim actionable under Wis. Stat. § 100.18.

¶ 9. The Milwaukee County Circuit Court, Jeffrey Kremers, Judge, granted Microsoft's motion and dismissed Olstad's complaint. In an oral ruling, Judge Kremers held that plaintiffs like Olstad could not recover under Chapter 133 because it does not extend to interstate commerce. Judge Kremers relied on a line of cases beginning with *Pulp Wood Co. v. Green Bay Paper & Fiber Co.*, 157 Wis. 604, 147 N.W. 1058 (1914).

¶ 10. Olstad appealed,[5] and the court of appeals certified the following issue to this court: "Does Wisconsin's antitrust act, Wis. Stat. § 133.03, apply to interstate commerce affecting Wisconsin commerce?" We accepted the certification.

¶ 11. In this appeal we are not concerned with the truth or merit of Olstad's allegations. The circuit court did not address the substance of the claim that Microsoft violated Chapter 133. The circuit court concluded that controlling precedent did not allow it to consider whether Chapter 133 had been violated because, as a threshold matter, the statute could not apply to the interstate conduct at issue. Accordingly, we must decide whether the Wisconsin statute reaches interstate commerce.

■■■

¶ 12. We review the circuit court's grant of summary judgment independently, applying the same meth-

---

[5] Olstad decided not to pursue the circuit court's dismissal of his claim under Wis. Stat. § 100.18, because he did not brief that issue to this court. Accordingly, we address only the issue certified by the court of appeals.

odology as the circuit court. *Smaxwell v. Bayard,* 2004 WI 101, ¶ 12, 274 Wis. 2d 278, 682 N.W.2d 923. Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). We evaluate the facts in the light most favorable to the nonmoving party, Olstad, and draw all reasonable inferences from the facts in his favor. *Garcia v. Mazda Motor of America,* 2004 WI 93, ¶ 4 n.3, 273 Wis. 2d 612, 682 N.W.2d 365. If, as here, the salient facts are undisputed, our task is simply to apply the law to the undisputed facts.

## II. DISCUSSION

¶ 13.   We note at the outset that Microsoft concedes that a state may regulate interstate commerce in some circumstances. This point is well settled. *See, e.g., California v. ARC America Corp.,* 490 U.S. 93, 101–02 (1989) (state laws may reach interstate commerce in indirect purchaser action); David Lamb, *Avoiding Impotence: Rethinking the Standards for Applying State Antitrust Laws to Interstate Commerce,* 54 Vand. L. Rev. 1705, 1721 (2001) ("[M]ost recent decisions have upheld state antitrust regulations despite their incidental impact on interstate commerce"); Herbert Hovenkamp, *State Antitrust in the Federal Scheme,* 58 Ind. L.J. 375, 386–87 (1983) ("applications of state antitrust laws to situations 'in or affecting' interstate commerce have rarely been condemned and nearly all cases that did condemn such applications were decided before 1935,

when judges had a much more restrictive view of the power of the states to regulate in interstate commerce").

¶ 14.  "[T]he most important point is that when a practice has sufficient effects within the state, that state has the power to apply its antitrust law . . . a state antitrust law of general application can virtually always be applied to a practice having sufficient effects within the state." Hovenkamp, *Antitrust Law*, ¶ 2403a (2d ed. 2000). State law is precluded from regulating interstate commerce only if it "unduly burden[s]" interstate commerce. Von Kalinowski, *Antitrust Laws & Trade Regulation* § 100.03 (2d ed. 2004).

¶ 15.  While conceding that Wisconsin may enact a statute reaching interstate commerce, Microsoft contends that our legislature has not done so. We turn to Wisconsin's antitrust act, Wis. Stat. § 133.03, to determine whether Microsoft is correct.

A.  Statutory Analysis

¶ 16.  At issue is Wis. Stat. § 133.03, which provides:

> 133.03 Unlawful contracts; conspiracies. (1) Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal. Every person who makes any contract or engages in any combination or conspiracy in restraint of trade or commerce may be fined not more than $100,000 if a corporation, or, if any other person, may be fined not more than $50,000 or imprisoned for not more than 7 years and 6 months or both.

> (2) Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or

commerce may be fined not more than $100,000 if a corporation, or, if any other person, may be fined not more than $50,000 or imprisoned for not more than 7 years and 6 months or both.

Wis. Stat. § 133.03.[6]

■

¶ 17. This court reviews de novo the circuit court's construction of the statute. *State v. Lombard,* 2004 WI 95, ¶ 17, 273 Wis. 2d 538, 684 N.W.2d 103.

■

¶ 18. Statutory interpretation begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry. *Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. We assign the words in the statute their common, ordinary, and accepted meaning. *Id.* We also consider the context and structure of the statute. *Id.,* ¶ 46. We interpret statutes to avoid absurd or unreasonable results and to give effect to every word in the text. *Id.*

¶ 19. Olstad argues that the plain language of the statute shows that it applies to interstate commerce because of the absence of any language expressly limiting the scope of the statute. On its face, the statute refers to "every contract," "any contract," and "every person" without restricting its purview to Wisconsin contracts or persons in Wisconsin. Wis. Stat. § 133.03.

¶ 20. Olstad also directs our attention to the context of the statute, namely, the expression of legislative intent in Wis. Stat. § 133.01:

---

[6] The legislature revised this statute effective February 1, 2003, to alter its penalty provisions. The revision is not material to this appeal and we will not address it further. *See* 2001 Wis. Act 109.

The intent of this chapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition. It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition. It is the intent of the legislature to make competition the fundamental economic policy of this state and, to that end, state regulatory agencies shall regard the public interest as requiring the preservation and promotion of the maximum level of competition in any regulated industry consistent with the other public interest goals established by the legislature.

Wis. Stat. § 133.01.

¶ 21. Microsoft does not address the broad language of Wis. Stat. § 133.03. Instead it relies on several cases that, it claims, interpret the statute's plain language to apply only to purely intrastate conduct. Microsoft then quotes *Zimmerman v. Wisconsin Electric Power Co.*, 38 Wis. 2d 626, 633–34, 157 N.W.2d 648 (1968), to the effect that:

It has often been said that once a construction has been given to a statute, the construction becomes part of the statute; and it is within the province of the legislature alone to change the law.

. . . Where a law passed by the legislature has been construed by the courts, legislative acquiescence in or refusal to pass a measure that would defeat the courts' construction is not an equivocal act. The legislature is presumed to know that in absence of its changing the law, the construction put upon it by the courts will remain unchanged.

Microsoft asserts that the judicial gloss this court has placed on the language of Wis. Stat. § 133.03 unambigu-

ously shows that the statute can be applied only to purely intrastate commerce.

¶ 22. The evidence to support Microsoft's argument begins with *Pulp Wood*. This was also the case principally relied upon by the circuit court. In *Pulp Wood,* the court evaluated an allegedly illegal contract made in Wisconsin involving a wood supply from Wisconsin, Minnesota, Michigan, and Canada. *Pulp Wood,* 157 Wis. at 615. The court stated: "The contract we think involved interstate commerce, and if so the federal statute is applicable and the case will be treated on that basis." *Id.* at 615. However, the court noted that it observed "little difference" whether the state or federal statute or both applied. *Id.* at 616. It added that the state statute "is a copy of the federal statute, except that it applies to attempts to monopolize trade and commerce within the state . . . ." *Id.* at 625.[7]

¶ 23. Most of our cases since *Pulp Wood* have followed its bright line division between interstate commerce (governed by the federal statute) and intrastate commerce (governed by Chapter 133) without further analysis. *See, e.g., Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 168 Wis. 400, 404–05, 170 N.W. 230 (1919) (*Pulp Wood II*) ("[T]he contract in question involved interstate commerce, and hence the federal statute is the statute to be applied to the case, although little, if any, difference is to be observed in the result in

---

[7] In its decision, the court did not declare the contract void. It remanded the case to the circuit court for Brown County. *Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 157 Wis. 604, 625, 147 N.W. 1058 (1914). The case was tried to the court, which dismissed the complaint on the ground that the contract was void "because [the contract was] contrary to both the federal and state anti-trust statutes." *Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 168 Wis. 400, 402, 170 N.W. 230 (1919).

the present case whether the state or the federal statutes, or both, apply"); *State v. Lewis & Leidersdorf Co.,* 201 Wis. 543, 549, 230 N.W. 692 (1930) ("sec. 133.01 [has] application to intrastate as distinguished from interstate transactions"); *Reese v. Assoc. Hosp. Serv., Inc.,* 45 Wis. 2d 526, 532, 173 N.W.2d 661 (1970) ("Sec. 133.01 . . . has been held by this court to be a reenactment of the first two sections of the federal Sherman Antitrust Act, with application to intrastate as distinguished from interstate transactions"); *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis. 2d 402, 410, 198 N.W.2d 363 (1972) (same); *Grams v. Boss,* 97 Wis. 2d 332, 346, 294 N.W.2d 473 (1980) (same); *Conley Publ'g Group v. Journal Communications,* 2003 WI 119, ¶ 16, 265 Wis. 2d 128, 665 N.W.2d 879 ("the scope of Chapter 133 is limited to intrastate transactions"). Microsoft emphasizes the importance of *Grams* and *Conley Publishing* because both were decided *after* a 1980 revision of Chapter 133.

¶ 24. There are two notable exceptions to this line of cases. In *State v. Allied Chemical & Dye Corp.,* 9 Wis. 2d 290, 101 N.W.2d 133 (1960), the court evaluated the circuit court's grant of summary judgment to three defendant corporations. The court reversed, concluding that even though the acts at issue involved interstate commerce and none of the defendants owned, operated, or maintained "any manufacturing plant, sales or other office, warehouse, or stock of calcium chloride in the state of Wisconsin," Chapter 133 could apply. *Id.* at 292, 296. Without elaboration, the court held:

> 1. There is no language in the federal enactments that pre-empts the field of regulation and enforcement in the federal government or that precludes the states from enacting effective legislation dealing with such unlawful practices.

2. There is no conflict between the federal and state statutes.

3. The Wisconsin statutes make no attempt to regulate or burden interstate commerce.

*Id.* at 295.

¶ 25.   The *Allied Chemical* court also concluded that "The public interest and welfare of the people of Wisconsin are substantially affected if prices of a product are fixed or supplies thereof are restricted as the result of an illegal combination or conspiracy. The people of Wisconsin are entitled to the advantages that flow from free competition . . . ." *Id.* The briefs in *Allied Chemical* permit no doubt that our court was challenged by the Department of Justice to apply Wisconsin's antitrust statute to *interstate* commerce, and it did.[8]

---

[8] In its brief, the State argued that even though the respondent corporations were "undoubtedly engaged in interstate commerce, they are subject to prosecution for violating the applicable Wisconsin Statutes by conspiring to fix and control the prices at which other defendants" in Milwaukee sold calcium chloride to Milwaukee County. The State quoted *Leader Theatre Corp. v. Randforce Amusement Corp.,* 58 N.Y.S.2d 304, 307 (1945): "It is now well established that states, under their police powers, can enact and implement legislation which affects interstate commerce, when such commerce has significant local consequences." The State summed up: "While there is no denying that the respondents are engaged in interstate commerce and that all of the calcium chloride sold in Wisconsin is shipped in interstate commerce, significant and necessary parts of this conspiracy are alleged to have been carried out in [Wisconsin], concern this state and are within the jurisdiction of our courts."

The three chemical companies answered: "After the calcium chloride leaves the producing point *no employee or agent* of the

239

¶ 26. In *State v. Milwaukee Braves, Inc.*, 31 Wis. 2d 699, 144 N.W.2d 1 (1966), the court addressed the departure from Wisconsin of the Milwaukee Braves baseball club. The State charged that major league baseball unlawfully practiced monopolistic conduct in violation of Chapter 133. *Id.* at 702. Despite the interstate nature of major league baseball, the court appeared willing to apply Wisconsin's antitrust statute, noting:

> [Major League Baseball] terminated very substantial business activity in Wisconsin . . . . On their face, these facts support a conclusion that there is a combination or conspiracy in restraint of trade and commerce, declared illegal by the first sentence of sec. 133.01, Stats., as well as a combination to monopolize trade, under the third sentence of the section.
>
> . . . .
>
> The state may, ordinarily, protect the interests of its people by enforcing its antitrust act against persons doing business in interstate commerce . . . . (citing *Allied Chemical,* 9 Wis. 2d at 295.

*Id.* at 713–14, 721.[9]

respondent handles or has any contact with it." The corporations continued: "A corporation engaged in interstate commerce may, of course, be subject to state antitrust laws *for violations which occur in connection with transactions which are wholly intrastate.*" (Emphasis added.)

The focused argument by the parties in *State v. Allied Chemical & Dye Corp.,* 9 Wis. 2d 290, 101 N.W.2d 133 (1960), put the court's decision in context.

[9] In his dissenting opinion, Justice Nathan Heffernan wrote:

¶ 27.  The *Milwaukee Braves* court declined to enforce Chapter 133 in part because of major league baseball's well-settled exception from the antitrust laws. *Id.* at 725. But all seven members of the court asserted that Chapter 133 could be applied to interstate commerce.

¶ 28.  Taking this authority into account, we conclude that Chapter 133 has been interpreted inconsistently. Wisconsin Stat. § 133.03 is ambiguous, in that reasonably well-informed observers have interpreted it in two different senses. The language itself provides no express limit to the statute's scope, but this court ascribed a limit to the statute as recently as 2003. *Conley Publ'g,* 265 Wis. 2d 128, ¶ 16. To resolve this ambiguity, we turn to both intrinsic and extrinsic sources, including legislative history, to determine the intent of the legislature. *Kalal,* 271 Wis. 2d 633, ¶¶ 43, 50.

## B.  Legislative History

¶ 29.  The late nineteenth century saw the birth and growth of the earliest antitrust laws, a genesis that took place against a backdrop dominated by principles of dual federalism dating back to the Founding Era. *Cf.*

> It is well settled that a state may exercise its police powers through such devices as the antitrust laws even though an incidental benefit may be to local commerce, providing that the law or its operation do not discriminate against interstate commerce or disrupt its required uniformity. There is no intimation . . . that the Wisconsin antitrust laws are applied in a discriminatory manner. It is equally clear that state antitrust laws can be enforced concurrently with, or in the absence of, federal regulation.

*State v. Milwaukee Braves, Inc.,* 31 Wis. 2d 699, 739, 144 N.W.2d 1 (1966) (Heffernan, Hallows, and Beilfuss, JJ., dissenting) (internal citations omitted).

James May, *Antitrust Practice and Procedure in the Formative Era: The Constitutional and Conceptual Reach of State Antitrust Law, 1880–1918,* 135 U. Pa. L. Rev. 495, 497–99, 518 (1987). The Wisconsin Legislature enacted Wisconsin's antitrust act in 1893. *See* ch. 219, Laws of 1893. It did not act in a vacuum. It was influenced by the constraining boundaries of federal commerce clause jurisprudence.

¶ 30.  Article I, Section 8, clause 3 of the federal constitution gives Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const., art. I § 8 cl.3. The Supreme Court's early cases made clear that this "commerce clause" also has a negative or "dormant" form restricting the states' ability to regulate interstate commerce. *Quill Corp. v. North Dakota,* 504 U.S. 298, 309 (1992) (citing *Gibbons v. Ogden,* 22 U.S. 1, 231–232, 239 (1824) (Johnson, J., concurring) ("It would be in vain to deny the possibility of a clashing and collision between the measures of the two governments. . . . [W]hen [a collision] does arise, the question must be decided how far the powers of Congress are adequate to put it down.")).

¶ 31.  Chief Justice Marshall shaped early conceptions of the role of the national government. "If any one proposition could command the universal assent of mankind we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action." *M'Culloch v. Maryland,* 17 U.S. 316, 405 (1819). Marshall believed that the federal government could employ any means not expressly prohibited to it as long as it acted within the "sphere of its specified powers." *Id.* at 384. In so holding, the Court implied that the states, too, are sovereign within their spheres of influence.

¶ 32.  Marshall's concept of mutually exclusive spheres of influence dominated judicial analysis throughout most of the nineteenth century. "It is unquestionably no easy task to . . . fix the precise point, in relation to every important article, where the paramount power of Congress terminates, and that of the State begins." *Thurlow v. Massachusetts,* 46 U.S. 504, 574 (1847) (Opinion of Taney, C.J.[10]).

¶ 33.  During the latter half of the nineteenth century, the concept of "spheres of influence" attained nearly impregnable status as black letter law. "The general government, and the States, although both exist within the same territorial limits, are separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres." *The Collector v. Day,* 78 U.S. 113, 124 (1870).

¶ 34.  Shortly before the passage of the federal Sherman Act, the Court pronounced that "no state has the right to lay a tax on interstate commerce in any form." *Leloup v. Port of Mobile,* 127 U.S. 640, 648 (1888). The court believed that such a tax would be a "burden" on interstate commerce, regulation of which "belongs solely to congress." *Id.* To put it in Marshall's terms, the Court believed that interstate commerce fell within the "sphere" of federal power, to the total exclusion of state power. *M'Culloch,* 17 U.S. at 384.

¶ 35.  Antitrust law was born in this era of mutually exclusive sovereignties. At least 13, and possibly as many as 21, states acted before Congress passed the Sherman Act. *Compare ARC America,* 490 U.S. at 101 n.4, *with* May, *supra* at 499. Wisconsin was not one of these states.

---

[10] In *Thurlow v. Massachusetts,* 46 U.S. 504 (1847), popularly known as *"The License Cases,"* the Court did not file a majority opinion; each Justice concurred separately.

¶ 36.   In 1890 Congress passed the Sherman Act. It provided:

> (1) Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. . . .
>
> (2) Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.
>
> . . . .
>
> (8) That the word "person," or "persons," wherever used in this act shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country.

Sherman Antitrust Act, ch. 647 §§ 1–8, 26 Stat. 209 (1890) (codified as amended at 15 U.S.C. §§ 1–7 (2000)).

¶ 37.   Although the passage of a federal statute so similar to then existing state laws—and so similar to the state laws passed shortly thereafter—raises the specter of federal preemption, the legislative history reveals that Congress did not intend to preempt state laws. *See* Hovenkamp, *Antitrust Law* § 2401a, at 290 (2d ed. 2000). Rather, in accord with the dominating theory of the era, Congress intended the federal law to apply only to interstate cases while the state laws continued to apply to intrastate cases. *See id.*

¶ 38. The federal constitution is clearly "the supreme law of the land." U.S. Const. art. VI, cl. 2. Therefore, a federal law regulating interstate commerce may preempt a state law on the same topic. Federal preemption may occur through express preemption or implied preemption. *Gorton v. Am. Cyanamid Co.,* 194 Wis. 2d 203, 215–16, 533 N.W.2d 746 (1995). Congress may expressly preempt contradictory—or even coterminous—state laws in the text of the laws it passes. In that event, the state laws must yield to the federal law. Congress may also impliedly preempt state laws by completely occupying a given regulatory field. *Id.* However, if the preemption is only implied, courts typically require clear evidence of legislative intent to preempt. *Id.* at 216. In a similar vein, the United States Supreme Court has stated that there is a "strong presumption" against a finding of preemption. *Id.* at 219 (citing *Cipollone v. Liggett Group,* 505 U.S. 504, 523 (1992)).

¶ 39. But Congress has neither expressly (in the language of the Sherman Act) nor impliedly attempted to preempt state antitrust laws. *See ARC America,* 490 U.S. at 102 (citing *Watson v. Buck,* 313 U.S. 387, 403 (1941); *Puerto Rico v. Shell Co.,* 302 U.S. 253, 259–60 (1937)). Before the passage of the Sherman Act, its sponsor, Senator John Sherman of Ohio, stated: "Each state can and does prevent and control combinations within the limit of the state. This we do not propose to interfere with." 21 Cong. Rec. 2456, 2460. In fact, "Congress has never expressed the least willingness to limit state antitrust by making federal antitrust 'occupy the field,' thus preempting state law. The result is that federal and state policy often overlap and address

precisely the same practices, often with inconsistent results." Hovenkamp, *Antitrust Law,* ¶ 216 (2d ed. 2000).

¶ 40. We discuss preemption only for the sake of completeness, as Microsoft has not argued that the Sherman Act preempts Wisconsin's antitrust laws.

¶ 41. Three years after the passage of the Sherman Act, the Wisconsin Legislature enacted its own antitrust act. *See* ch. 219, Laws of 1893. The 1893 law provided:

> (1) Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce, is hereby declared illegal.
>
> (2) Every person who shall monopolize, or attempt to monopolize, or combine, or conspire with any other person or persons to monopolize any part of the trade or commerce *in this state,* shall be deemed guilty of violating the provisions of this act, and upon conviction thereof shall forfeit for each such violation not less than fifty dollars, nor more than three thousand dollars . . .
>
> . . . .
>
> (8) The word "person" or "persons," wherever used in this act, shall be deemed to include corporations, partnerships, individuals and associations existing under or authorized by the laws of the United States, the laws of any of the territories, the laws of this or any other state, or the laws of any foreign country.

Ch. 219, Laws of 1893 (codified at Wis. Stat. § 1747e (1898)) (emphasis added).

¶ 42. Comparison of the language and structure of the Sherman Act and Wisconsin's antitrust act reveals many similarities. The pivotal language in the first two sections is nearly identical. This has led courts

and commentators to refer to that first incarnation of Wisconsin's antitrust act as the "Little Sherman Act." *See, e.g., Conley Publ'g,* 265 Wis. 2d 128, ¶ 18.

¶ 43. The dawn of the twentieth century coincided with the heyday of the federal "trust-busters" led by President Theodore Roosevelt. *See* Marc Winerman, *The Origins of the FTC: Concentration, Cooperation, Control and Competition,* 71 Antitrust L.J. 1, 16 (2003);[11] *see generally* Edwin J. Hughes, *The Left Side of Antitrust: What Fairness Means and Why It Matters,* 77 Marq. L. Rev. 265, 292 (1994). The early twentieth century presidents implemented policies favoring broad application of the Sherman Act—and furthered the stratification of the state and federal antitrust laws. *See generally* Hughes, 77 Marq. L. Rev. at 292 (noting that in 1912, Woodrow Wilson made attacks on trusts one of the centerpieces of his successful presidential campaign).

¶ 44. By 1914 antitrust regulation was "most prominent as a political issue." *Id.* This court's 1914 holding in *Pulp Wood* is best understood in light of the dominant conception of the time, fathered by Chief Justice Marshall, that the federal government and the various state governments existed in mutually exclusive spheres, with no overlap. *See M'Culloch,* 17 U.S. at 405. As the *Pulp Wood* court expressed it: "The contract we think involved interstate commerce, and if so the federal statute is applicable and the case will be treated on that basis." *Pulp Wood,* 157 Wis. at 615. That determination reflected the outlook of the era, even

---

[11] Roosevelt's predecessor, William McKinley, had initiated only three antitrust cases in four years of his presidency; Roosevelt initiated 45 cases during his eight years in office. Marc Winerman, *The Origins of the FTC: Concentration, Cooperation, Control and Competition,* 71 Antitrust L.J. 1, 16 (2003).

though the disputed contract was made in Wisconsin and its effects were felt in Wisconsin.

¶ 45.   In 1921 the Wisconsin Legislature undertook the first significant revision to the 1893 act. Ch. 458, Laws of 1921. The legislature chose to "amend and renumber" the first section of the statute. *Id.* The new section stated:

> Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is hereby declared illegal. Every combination, conspiracy, trust, pool, agreement or contract intended to restrain or prevent competition in the supply or price of any article or commodity in general use *in this state, to be produced or sold therein or constituting a subject of trade or commerce therein,* or . . . in any manner control the price of any such article or commodity . . . manufactured, mined, produced or sold *in this state,* or fix any standard or figure in which its price to the public shall be in any manner controlled or established, is hereby declared an illegal restraint of trade. Every person, corporation, copartnership, trustee or association who shall . . . monopolize or attempt to monopolize any part of the trade or commerce *in this state* shall forfeit for each offense not less than one hundred dollars nor more than five thousand dollars. Any such person . . . shall also be liable to any person transacting or doing business *in this state* for all damages he may sustain by reason of the doing of anything forbidden by this section.

*Id.* (emphasis added). The amendment is notable not because it made major substantive changes to the law, but because of its repeated use of the phrase "in this state."[12] The phrase had appeared once in the 1893 legislation that copied the Sherman Act. The sentence

---

[12] The Legislature also made minor changes to what is now Wis. Stat. § 133.03 in 1923, 1945, 1947, 1957, 1969, and 1975.

from the Sherman Act, "Every person who shall . . . conspire . . . to monopolize any part of the trade or commerce *among the several States*," was changed in the Wisconsin legislation to read, "Every person who shall . . . conspire . . . to monopolize any part of the trade or commerce *in this state*." Although, in hindsight, the language could have been interpreted to focus on the place where the effects of a conspiracy were felt as opposed to the place where the conspiracy was hatched, this does not appear to have been the initial interpretation. Consequently, the addition of three more "in this state" phrases to the section was not inconsequential. It must be noted, however, that the phrase "in this state" is linked to the word "sold," meaning that it could distinguish the manufacture or production of an article from its sale.

¶ 46. As the twentieth century unfolded, this court formally adhered to *Pulp Wood. See, e.g., Pulp Wood II,* 168 Wis. at 404–05; *Lewis & Leidersdorf Co.,* 201 Wis. at 549. But the face of federalism was changing. The line between Chief Justice Marshall's mutually exclusive spheres of influence began to blur, as noted by the United States Supreme Court's decision in *H.P. Hood & Sons, Inc. v. DuMond,* 336 U.S. 525 (1949), in which the Court recognized "broad power in the State to protect its inhabitants against perils to health or safety, fraudulent traders and highway hazards even by use of measures which bear adversely on interstate commerce." *Id.* at 531–32 (citations omitted).

¶ 47. By 1978 the erosion of Marshall's "spheres of influence" concept was complete. In *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429 (1978), the Court acknowledged that "state legislation, designed to serve legitimate state interests and applied without

249

discrimination against interstate commerce, does not violate the Commerce Clause even though it affects commerce." *Id.* at 440.

¶ 48.  The *Rice* Court characterized the process of evaluating a state law under the dormant commerce clause as one of "delicate adjustment" and announced a balancing test, believing that "no single conceptual approach identifies all of the factors that may bear upon a particular case." *Id.* at 440–41. The Court framed the inquiry as a balance between the state regulatory concern and the burden imposed on interstate commerce.

¶ 49.  The Court elaborated on the test courts should use to determine whether a state law unduly burdens interstate commerce:

> [T]he general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 441–42 (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970) (internal citations omitted).

¶ 50.  This "delicate" balancing test, expressing the Court's view of the commerce clause in 1978, is dramatically different from the rigid interpretation of the same clause in the late nineteenth century.

¶ 51.  In 1980 the Wisconsin Legislature repealed and recreated Chapter 133 of the statutes. Ch. 209,

Laws of 1979. As in 1893, it did not act in a vacuum. When it recreated this chapter, the legislature acted in an entirely different era of commerce clause jurisprudence than at the time of the law's original passage.

¶ 52. By 1980 the United States Supreme Court had clearly abandoned the notion that there might be a "precise point, in relation to every important article, where the paramount power of Congress terminates, and that of the State begins." *Thurlow,* 46 U.S. at 574. That view had been replaced by the Court's new perception that states could burden interstate commerce unless the burden was "clearly excessive" in relation to the local benefits. *See Rice,* 434 U.S. at 441–42.

¶ 53. Conversely, the Supreme Court had approved federal legislation under the commerce clause that might, in an earlier era, have been considered regulation of intrastate commerce. In *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241 (1964), the Court's analysis was revealing:

> It is said that the operation of the motel here is of a purely local character. But, assuming this to be true, "[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Women's Sportswear Mfrs. Assn.,* 336 U.S. 460, 464 (1949). As Chief Justice Stone put it in *United States v. Darby* [312 U.S. 100, 118 (1941)]:
>
> > The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regu-

251

late interstate commerce. *See [M'Culloch] v. Maryland,* 4 Wheat. 316, 421.

. . . .

> Thus the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce. . . .

*Id.* at 258 (internal citation omitted).

¶ 54. If a state were to confine itself to the regulation of what remained as purely intrastate commerce after *Heart of Atlanta Motel,* it would not be regulating much.

¶ 55. Against this new backdrop, the legislature recreated Chapter 133. Microsoft discounts the significance of the 1980 legislation, arguing that the legislature "did not intend to alter the long-standing interpretation of the act." After careful review, however, we think the 1980 action leaves little doubt of the legislature's intent to apply the Wisconsin antitrust statute to interstate commerce.

¶ 56. First, 1979 Assembly Bill 831, which led to 1979 Act 209, was introduced "by request of Attorney General Bronson C. La Follette." Representative Mary Lou Munts, the principal Assembly author, had introduced a bill to repeal and recreate Chapter 133 in 1977. *See* 1977 A.B. 685. It proved to be very controversial and did not pass. Her legislation was revised for the 1979 session with the help of the Wisconsin Department of Justice, and the new version was given the official imprimatur of the Attorney General. In testimony on the 1979 bill, Representative Munts said: "I am very pleased to have been involved with the Justice Department in the Effort to revise Chapter 133, the

Wisconsin Statute on Trusts and Monopolies. We are indebted to the work of the Attorney General's office for the basic revision and to a number of attorneys with anti-trust experience for their suggestions for significant improvements in our current statutes." Testimony of Mary Lou Munts dated October 8, 1979 (located in Legislative Council Files, Madison, Wisconsin).

¶ 57. On October 3, 1979, Attorney General La Follette wrote the chair of the Assembly Commerce and Consumer Affairs Committee, Representative Marjorie (Midge) Miller. He indicated that Assembly Bill 831 was a "comprehensive revision of Chapter 133, Wisconsin's antitrust law." He wrote that the "revision is the result of many hours of work by University of Wisconsin Law School faculty, members of the private bar, legislators, and members of the Department of Justice." Letter to Representative Marjorie Miller from Attorney General Bronson C. La Follette dated October 3, 1979 (located in Legislative Council files, Madison, Wisconsin).

¶ 58. Nineteen years before Assembly Bill 831 was introduced, the State argued its authority to regulate interstate commerce in the *Allied Chemical* case and won. Three years before Assembly Bill 831 was introduced, the Wall Street Journal published a story on state antitrust enforcement. It cited Wisconsin Assistant Attorney General Michael Zaleski to the effect that in 1975, Wisconsin's antitrust division won 29 convictions against businesses, filed 32 consent decrees, and recovered almost $1 million. Timothy D. Schellhardt, *Antitrust Enforcement Stepped Up by States: Budgets, Staffs Grow,* Wall St. J., Oct. 4, 1976. Legislative files show that Zaleski played a key role in developing Assembly Bill 831. One year before Assembly Bill 831 was introduced, the Wisconsin Department of Justice argued *Raymond Motor Transportation, Inc. v.*

253

*Rice,* in the United States Supreme Court. The case was argued by Albert Harriman, an assistant attorney general who helped write the State's brief in *Allied Chemical.* As noted above, *Rice* is one of the key cases revitalizing state power to regulate interstate commerce.

¶ 59. A few months before introduction of Assembly Bill 831, Attorney General La Follette spoke at the Antitrust Seminar of the National Association of Attorneys General and stated: "[I]t is now more likely that the wrath of state antitrust enforcement will be felt by violators than that of the federal government." Press Release, State of Wisconsin Department of Justice (May 18, 1979) (on file at Wisconsin Legislative Reference Bureau).

¶ 60. Because Assembly Bill 831 was so closely linked to the Wisconsin Department of Justice, it must have reflected the thinking of the Wisconsin Department of Justice that Chapter 133 reached interstate commerce, for that was the interpretation the Department consistently gave to the statute after the *Allied Chemical* decision.

¶ 61. Second, one of the major objectives of the 1980 legislation was to "reverse" the holding in *Illinois Brick Co. v. State of Illinois,* 431 U.S. 720 (1977). In *Illinois Brick,* the Supreme Court concluded that indirect purchasers harmed by antitrust violations could not recover under federal antitrust law. Assembly Bill 831 addressed this deficiency in Wis. Stat. § 133.18, which provides in part: "[A]ny person injured, *directly or indirectly,* by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person . . . ." (Emphasis added.)

254

¶ 62. In his letter to Representative Marjorie Miller of October 3, 1979, Attorney General La Follette wrote:

> An important new change would reverse the effect of the U.S. Supreme Court's ruling in the *Illinois Brick* case on Wisconsin law. The Court, in that case, ruled that only direct purchasers may recover damages for illegally price-fixed goods. Thus, indirect purchasers — such as state and local governments which purchase most of their supplies through wholesalers, retailers or other middlemen — are left out in the cold when it comes to recovering for the illegally inflated prices they and their constituents must pay. As only one example of how this adversely affects Wisconsin and its taxpayers, my office recently returned nearly a half million dollars to numerous Wisconsin schools, hospitals, municipalities, and counties from a settlement of an antitrust case against manufacturers of contract hardware. Had the *Illinois Brick* decision been in effect in 1973, when this case was brought, we would not have been able to recover this money for Wisconsin taxpayers.

Letter to Representative Marjorie Miller from Attorney General Bronson C. La Follette dated October 3, 1979 (located in Legislative Council files, Madison, Wisconsin).

¶ 63. When the legislature permitted indirect purchasers to seek recovery for antitrust violations it certainly intended the statute to reach interstate commerce. This result was discussed and upheld in *ARC America*.[13] The Court's holding in *ARC America* reveals that at least under some circumstances, state antitrust

---

[13] In *California v. ARC America Corp.*, 490 U.S. 93 (1989), several states alleged violations of both federal and state antitrust law by an interstate monopoly of concrete block producers. *Id.* at 97. The parties settled the case, but the federal judge administering the settlement refused to allow indirect

statutes are expected to reach interstate commerce.[14] It would be completely unrealistic to interpret Wis. Stat. § 133.18 as being limited to intrastate commerce.

¶ 64. Third, turning directly to the text of the legislation, there is ample evidence of changes in prior law requiring a new interpretation of the statute. This evidence supports four significant principles.

¶ 65. a. Chapter 133 was repealed and recreated, not simply amended. In her testimony, Representative Munts stated:

> Wisconsin's current anti-trust laws rest on a foundation begun over eighty years ago and are overdue for a *comprehensive revision.* . . .

---

purchasers to have access to the settlement fund because he believed that federal law preempted the state antitrust statutes. *Id.* at 99. The Supreme Court held that the state "repealer" statutes were not preempted. *Id.* at 101.

[14] Wisconsin's Department of Justice has certainly interpreted the law as enabling it to reach activities in interstate —and even international—commerce. *See* Press Release, Wisconsin Department of Justice, Doyle Announces Historic Settlements With Vitamin Companies; Six Manufacturers Agree to Pay More Than $335 Million (Oct. 10, 2000), available at www.doj.state.wi.us. In the "vitamin cases," Wisconsin led 23 states alleging that the six companies met in secret in locations "around the world" to fix vitamin prices, harming indirect purchasers. *Id.* The states alleged violations of "state and federal law." *Id.* The six companies involved are giants in international commerce, including BASF of Germany and Eisai Company of Japan. *Id.* Three of the companies were European and three were Japanese. *Id.* None was based in the United States, let alone Wisconsin.

We recognize that the Department's conduct cannot, sua sponte, legitimize the underlying statute. However, it is persuasive evidence that in practice, commercial parties tacitly agree that Wisconsin's law may apply to interstate—even international —commerce.

Because the laws concerning anti-trust have been enacted in [ ] piecemeal fashion, conflicts have arisen in the interpretation and wording of the various sections. . . .

AB 831 not only *clarifies the scope and intent* of Wisconsin's anti-trust laws, but also insures that the state's statutes are brought into line with federal statutes. . . . .

. . . .

AB 831 . . . broadens critical sections of the statutes [citing sections including section 133.03].

In conclusion, AB 831 will eliminate many ambiguities in the present statutes. More importantly, it will improve compatibility with federal anti-trust law, enhance state enforcement and insist on the preservation of a competitive climate in Wisconsin. . . .

Testimony of Mary Lou Munts dated October 8, 1979 (located in Legislative Council files, Madison, Wisconsin) (emphasis added).

¶ 66. In an October 5, 1979, memorandum to Representative Miller, a senior staff attorney for the Legislative Council, Russ Whitesel, wrote: "This Bill is a complete revision of the state anti-trust and monopoly law, Ch. 133 . . . ." Wisconsin Legislative Council Staff Memorandum to Representative Midge Miller from Russ Whitesel, Senior Staff Attorney dated October 5, 1979 (located in Wisconsin Legislative Council files, Madison, Wisconsin). In testimony on October 8, 1979, a representative of Wisconsin Manufacturers and Commerce, Fred W. Shaffer, said "AB 831 does far more than revise existing Wisconsin law. It changes it significantly." Testimony of Fred W. Shaffer dated October 8, 1979 (located in Legislative Council files, Madison, Wisconsin).

¶ 67. These statements contradict Microsoft's interpretation of the 1980 action and document a comprehensive revision of the law.

¶ 68. b. The legislature created a very broad statement of legislative intent in a new section 133.01. This declaration said in part: "It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition."

¶ 69. Wisconsin's Little Sherman Act did not have a declaration of intent in 1914 when this court decided the *Pulp Wood* case. Moreover, section 133.01 [now § 133.03] was not covered by any legislative declaration of intent until revision of the whole chapter in 1980. A previous statement of intent applied to only "ss. 133.17 [through] 133.185." Thus, the 1980 legislation not only added the phrase "most liberal construction," but also applied the legislative declaration to § 133.03 for the first time.

¶ 70. This court has often used legislative declarations as a valuable aid to our analysis. *See, e.g., LeMere v. LeMere,* 2003 WI 67, ¶ 15, 262 Wis. 2d 426, 663 N.W.2d 789; *Wood v. City of Madison,* 2003 WI 24, ¶ 18, 260 Wis. 2d 71, 659 N.W.2d 31; *Ocasio v. Froedtert Mem'l Lutheran Hosp.,* 2002 WI 89, ¶ 14, 254 Wis. 2d 367, 646 N.W.2d 381.

¶ 71. c. The Legislature deleted references to "in this state" in the Little Sherman Act portion of the chapter. Considering that Assembly Bill 831 came out of the Department of Justice and the elimination of the phrase "in this state" furthered the Department's views, a reasonable inference may be drawn that the elimination has significance. Microsoft directs our attention to *Emergency One, Inc. v. Waterous Co.,* 23 F. Supp. 2d 959, 963–64 (1998), in which a federal district court faced

with the same question dismissed the repeated deletion of "in this state" as insignificant. We disagree. It is true enough that we have no document addressing the issue directly. Nonetheless, in interpreting the statute in context, we believe the deletion carries some weight.

¶ 72. d. If we discount the prevailing atmosphere of 1893 in an interpretation of Wis. Stat. § 133.03, we are left with an exceptionally broad statute that uses such phrases as "*Every* contract . . . or conspiracy," "*Every* person," "*any* contract," "*any* combination," and "*Every* person who . . . *attempts* to monopolize." The text itself does not permit a limiting construction.

¶ 73. Finally, we address the principle of statutory interpretation stated in *Zimmerman* that "once a construction has been given to a statute, the construction becomes part of the statute; and it is within the province of the legislature alone to change the law." *Zimmerman,* 38 Wis. 2d at 633. In the *Allied Chemical* and *Milwaukee Braves* cases, this court gave a focused construction to the statute. We think it is far more likely that in 1980 the legislature acquiesced in or strengthened the interpretation of *Allied Chemical* than that it revised the statute with the intent of undoing that decision.

¶ 74. In short, we conclude that Chapter 133, particularly § 133.03, applies to interstate commerce, at least in some circumstances. Consistent with this holding, we withdraw the language from *Conley Publishing* that "the scope of Chapter 133 is limited to intrastate transactions." *See Conley Publ'g,* 265 Wis. 2d 128, ¶ 16.

¶ 75. The United States District Court in Milwaukee reached the same conclusion in the *Emergency One* case. The court extensively analyzed the history and

purpose of Chapter 133, and determined that it applies to interstate commerce under some circumstances. 23 F. Supp. 2d at 966–67. Like this court, the *Emergency One* court was persuaded by the legislative history of the 1980 revision, particularly the portion legislatively repealing *Illinois Brick,* as well as our holdings in *Allied Chemical* and *Milwaukee Braves. Emergency One,* 23 F. Supp. 2d at 966–67.

¶ 76.   In 1997 the Seventh Circuit considered an antitrust case involving an Alabama statute in which the defendants, manufacturers and wholesalers of prescription drugs, made similar arguments to those Microsoft makes in this case. *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 612 (7th Cir. 1997). The defendants cited several cases seemingly showing that "Alabama's antitrust statute is indeed limited to intrastate commerce." *Id.* (citing *Georgia Fruit Exchange v. Turnipseed,* 62 So. 542, 546 (Ala. 1913) ("There being thus both a state and national law prohibiting unlawful combinations in restraint of trade—the one law relating to intrastate, the other to interstate, commerce . . . ")).[15]

¶ 77.   The Seventh Circuit rejected the defendant's argument. It stated:

> The cases on which the defendants rely . . . date from a period in which, interstate commerce being narrowly defined, and federal power to regulate such commerce being deemed exclusive, a state statute limited to intrastate commerce would have some, albeit a strictly limited, scope and could not have a greater scope no matter how much the state wanted it to. The

---

[15] The Alabama court's statement is remarkably similar to the language in *Pulp Wood:* "The contract we think involved interstate commerce, and if so the federal statute is applicable and the case will be treated on that basis." *Pulp Wood,* 157 Wis. at 615.

cases thus were not interpreting the statute; they were interpreting the Constitution as placing upper and lower bounds on the reach of the statute, and the Constitution has since been reinterpreted.

*Id.* at 612–13.

¶ 78.  The Seventh Circuit added: "If the statute is limited today as it once was to commerce that is not within the regulatory power of Congress under the commerce clause, it is a dead letter because there are virtually no sales, in Alabama or anywhere else in the United States, that are intrastate in *that* sense." *Id.* at 613. We agree.

¶ 79.  The Seventh Circuit thus interpreted the Alabama statute to have evolved in response to changing interpretations of the federal constitution.[16] In Wisconsin, the interpretation of our statute has changed not only because of evolution in constitutional theory, but also because the legislature acted to repeal and recreate Chapter 133 in 1980, with altered language.

---

[16] We acknowledge that the Alabama Supreme Court subsequently interpreted the same statute differently. *Abbott Laboratories v. Durrett,* 746 So. 2d 316, 337 n.5 (Ala. 1999). The Alabama court conducted an extensive review of the Supreme Court's commerce clause jurisprudence, as we have. *Id.* at 330–32. It reached the same conclusion we have: that during the late nineteenth century, the theory of "dual sovereignty" or, as we have termed it, "mutually exclusive spheres" of power, was predominant. *Id.* However, the Alabama court adopted an originalist construction of the statute, giving great weight to the Alabama Legislature's intent at the time it enacted the Alabama statute. *Id.* at 337 n.5. Specifically, the Alabama court relied on the presence of the phrase "within this state" in the original act. *Id.* The case here is different because, as we have discussed, our legislature repealed and recreated our antitrust act, expressly deleting all references to "in this state," after our decision in *Allied Chemical.*

¶ 80.   A number of state courts have construed statutes similar to Wisconsin's to reach interstate commerce. *See, e.g., C. Bennett Building Supplies, Inc. v. Jenn Air Corp.,* 759 S.W.2d 883, 888 (Mo. Ct. App. 1988); *State v. Sterling Theatres Co.,* 394 P.2d 226, 227 (Wash. 1964).

¶ 81.   We recognize that our holding implies that in some circumstances, a monopolist's conduct is actionable under either federal law, Wisconsin law, or both. This concern is not unique to antitrust law. Concerns about "double jeopardy" prosecutions date back to the adoption of the Bill of Rights. U.S. Const., Amend. V ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb"). As a general rule, a person is not unconstitutionally subject to double jeopardy when he is tried successively by different sovereigns for the same crime. *See United States v. Wheeler,* 435 U.S. 313, 317 (1978). This rule derives from the more general concept that the states and the federal government are separate sovereigns, each entitled to enforce its own laws. *Id.* at 320.

¶ 82.   Duplicative prosecution is one thing; duplicative recovery is another. "[I]t goes without saying that the courts can and should preclude double recovery by an individual." *E.E.O.C. v. Waffle House, Inc.,* 534 U.S. 279, 297 (2002).

¶ 83.   In summary, we conclude that Chapter 133 may reach interstate commerce under some circumstances.

C.   When May Chapter 133 Reach Interstate Commerce?

¶ 84.   Having determined that Wisconsin's antitrust law may apply to interstate commerce under some

circumstances, we are confronted with the question of what those circumstances are.

¶ 85. A civil plaintiff filing an action under Wisconsin's antitrust act must allege that (1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside Wisconsin; or (2) the conduct complained of "substantially affects" the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state. *Allied Chemical*, 9 Wis. 2d at 295. Operating with lesser standards would jeopardize the action, undermine the validity of our antitrust statute, and create the spectacle of Lilliputian harassment in Wisconsin courts. Questions of provincialism, favoritism, and undue burden on interstate commerce should be determined by resort to contemporary federal commerce clause jurisprudence. To say more is beyond the scope of this opinion.

*By the Court.*—The order of the circuit court is reversed and the cause is remanded.

¶ 86. SHIRLEY S. ABRAHAMSON, C.J., and ANN WALSH BRADLEY, J., did not participate.